## DONOVAN v. PENNSYLVANIA COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH
CIRCUIT.

No. 5. Argued January 5, 1905.—Decided November 27, 1905.

Although its functions are public, a railroad company holds the legal title to the property employed in the discharge of its duties, and while it must under all circumstances do everything reasonably necessary for the accommodation of passengers and shippers, it may use its property to the best advantage of the public and itself, and for that end may make reasonable rules and regulations for the use of its property consistent with the purposes for which it is created and not inconsistent with legally established regulations. When not unnecessary, unreasonable or arbitrary a railroad may make arrangements with, including the granting of special privileges to, a single concern to supply passengers arriving at its terminals with hacks and cabs, and it is not bound, at least in the absence of valid state legislation requiring it to do so, to accord similar privileges to other persons, even though they be licensed hackmen. Such an exclusive arrangement is not a monopoly in the odious sense of the word, nor does it involve an improper use by a railroad company of its property.

Public sidewalks and streets are for use by all on equal terms for proper purposes subject to valid regulations prescribed by the constituted authorities.

Where there is a continuing trespass by a number of parties, and a suit of law could only determine a particular controversy at a particular time, a court of equity may meet such an unusual emergency and by a comprehensive decree determine finally the controversy between the parties,

avoid a multiplicity of suits and conserve the public interest; and so *held* that the Pennsylvania Company could maintain a suit against hackmen combined together in disregard of its regulations, enjoining them from congregating upon the sidewalk adjacent to its terminal at Chicago so as to interfere with the ingress and egress of passengers.

The rights of a railroad company as abutting owner of the sidewalks adjacent to the property on which its station stands and those of its passengers are not paramount to the rights of the general public to legitimately use the sidewalk, and licensed hackmen unless forbidden by local regulations may, within reasonable limits, use a public sidewalk in properly prosecuting their calling so long as such use does not obstruct others in legitimately using it upon equal terms.

THIS suit involves some questions as to the relative rights of the parties in the use of a railroad passenger station and depot grounds, and in the use of the public sidewalk and street adjacent to such station and grounds.

The facts out of which the controversy has arisen are clearly established, and may thus be summarized:

By a lease executed in 1871 the Pennsylvania Company, a corporation of Pennsylvania engaged in transporting passengers and freight by railroad, acquired the possession and control of the Pittsburg, Fort Wayne and Chicago Railway and all its rolling stock and property—the latter railway extending from Pittsburg to a passenger station at or near the corner of Canal and Adams streets in Chicago.

In 1880 the lessee company erected on the leased premises a new passenger house, now known as the Union Passenger Station, which ever since has been and is now occupied and used by it and its tenants, the Chicago and Alton Railway Company, the Chicago, Burlington and Quincy Railway Company, the Chicago, Milwaukee and St. Paul Railway Company, and the Pittsburg, Cincinnati, Chicago and St. Louis Railway Company. The companies just named occupy and use that station under a perpetual lease by which the Pennsylvania Company, as between it and its tenants, has charge of the station with authority to control and manage all trains therein as well as all watchmen and employés in the business there transacted.

This passenger station is the only terminus in Chicago of each of those lines of railway, and through that station alone can the several companies using it conduct an exchange of passengers and baggage and the transportation and handling of the United States mail and express parcels.

The extent of the business done at that station is indicated by the statement that the Chicago and Alton Railway Company controls and operates in the transaction of what is commonly called interstate business over one thousand miles of railway; the Chicago, Burlington and Quincy Railway Company, over seven thousand miles; the Chicago, Milwaukee and St. Paul Railway Company, over six thousand miles; the Pittsburg, Cincinnati, Chicago and St. Louis Railway Company, over fourteen hundred miles; and the Pennsylvania Company, over one thousand miles.

At this station the average number of passengers arriving and departing is over thirty thousand each day; the average number of parcels of baggage daily received and delivered, is over two thousand two hundred; and the average number of tons of United States mail daily received and delivered is over two hundred and fifty. Passenger trains to the number of two hundred and fifty arrive and depart each day. This statement does not include the large number of express parcels daily handled at the station.

All tickets of interstate passengers arriving and departing from this station, known as through tickets, have attached to each a check or coupon for conveyance through Chicago to the station of the connecting line of railroad designated on such tickets and not running into or out of the passenger depot of the Pennsylvania Company. The latter company and the other companies named have contracts for the use of a line of omnibuses or conveyances for the performance of the services called for by such coupons or checks, and those omnibuses or conveyances form the only regular connecting lines of transportation between the Pennsylvania Company's station and the stations of other railways in Chicago.

Besides the Pennsylvania Company's station there are five other railway stations in Chicago.

The main entrance to and exits from the Pennsylvania Company's station for passengers, for employés and for the public using the station, is on Canal street about one hundred feet north of Adams street. Substantially all passengers, whether arriving or departing, pass through that entrance which is at the head of a flight of stairs leading down to and up from the station platform upon which trains arrive and depart.

The present suit was instituted by the Pennsylvania Company against the defendant Donovan and others, citizens of Illinois, for the purpose of protecting that company in the enjoyment of certain alleged rights and privileges in respect of its passenger station and depot grounds in Chicago. The plaintiff alleged that those rights had been violated by the defendants, and, unless enjoined from so doing, they would continue to violate them to its great damage.

After referring to its efforts for many years to protect incoming and outgoing passengers from extortion and annoyance practiced by local hackmen, expressmen and hotel runners congregating about its station and noisily soliciting the patronage of passengers, the plaintiff, besides stating the above facts, alleged that it was compelled in 1894 to institute a partial hack service of its own; and for the purpose of protecting the rights of passengers, it made on the thirty-first day of December, 1894, an arrangement or contract with one Eighme for the purpose of furnishing sufficient carriage and cab service to passengers arriving at its station, and gave to him for a carriage stand a small piece of ground, about thirty-two feet wide and about ten feet long, in the northwest corner of its passenger station at the corner of Madison street, near its power house, requiring him to keep at all times clean vehicles, carriages and cabs with uniformed, honest and competent drivers, who would be satisfactory to the company; to make charges for the use of such carriages and cabs only in accordance with the ordinances of the city of Chicago; that Eighme

had been allowed to place an agent inside the company's station to notify passengers that suitable cabs and carriages could be obtained from such agent; that by means of such arrangement the company made full provision for the wants of incoming passengers desiring cabs or carriages for transportation from its station to any part of Chicago. The arrangement or agreement with Eighme was terminated by the company on the thirty-first day of January, A. D. 1902, and a similar arrangement was made with the Parmelee Transfer Company, which thereafter succeeded Eighme in the same business, and now carried it on in the same manner.

The plaintiff charged a conspiracy and confederation among the defendants—hack drivers and members of the Chicago Hack, Coupé and Cab Drivers' Union—to injure its business and property rights, alleging that they daily gathered in numbers from eight to twenty men at a time, in rows and groups, upon the sidewalk in front of its main entrance, entered the company's station at its main entrance by twos and threes at a time without plaintiff's consent and against its express objections, and in loud and boisterous voices and manner solicited incoming passengers and baggage for their vehicles; that defendants, by their numbers and noisy calls, harassed and annoyed passengers, sometimes forcibly laying hold of them when leaving the station in order to secure their patronage, to the annoyance and confusion of passengers and to the injury and damage of the plaintiffs; that the number of the defendants, upon the arrival of each train at the entrance and within the station, soliciting business had become so great that by their boisterous actions and obstruction of the sidewalk and the interior of plaintiff's station without its consent, they had in large part deprived plaintiff of its lawful property rights in the street frontage and of the free and full use of its station and property, and thereby created and continued a private nuisance damaging to the plaintiff's property, depriving it of the full, lawful, beneficial use of its station and street frontage and of the main entrance thereto, and had prevented

and now daily prevented it from securing to passengers a free and uninterrupted passage from and to its station and to arriving and departing trains; and that by such acts of the defendants great and substantial damages were inflicted upon plaintiff's property different in kind and degree from that suffered by the general public, incapable of computation and which could not be compensated at law.

It was further averred in the bill that the defendants asserted the right—and acted upon that claim and assertion—to enter the station of the plaintiff at all times in such numbers as suited their purposes, to remain there and occupy such portions of the station as they saw fit in soliciting the custom of incoming passengers regardless of the consent or the regulations of the plaintiff or the use to which its property is lawfully devoted, and to the prejudice of its duties and business as a common carrier, and by their actions largely deprived the plaintiff of the control of its property, to its irreparable loss and damage.

Alleging that its rights could not be effectively protected except by the decree of a court of equity, the plaintiff prayed that the defendants be perpetually enjoined from "entering the station" of the plaintiff "for the purpose of soliciting the custom of incoming passengers for cabs, carriages, express wagons or hotels, respectively; and that the occupation of the sidewalk and street abutting the main entrance of your orator's said station by said defendants for the purpose of soliciting custom of passengers for their said cabs, carriages, express wagons and hotels be decreed to be a nuisance to your orator and damaging to its property; and that said defendants and each of them and all persons acting in concert with them, whose names are unknown to your orator, may be perpetually enjoined from congregating singly or in larger numbers upon the said sidewalk at the main or any other entrance of your orator's said station for the purpose of plying their respective vocations as hackmen, cabmen, expressmen or hotel runners, and from interfering with or soliciting the custom of any of the passengers

upon the sidewalk adjoining said station at any main or other entrance to said station; and that your orator may have such other and further relief in the premises as the nature of its case may require and to your honors shall seem meet."

The defendants filed an answer putting in issue the material allegations of the bill, and insisting upon their legal right to have their vehicles in the public street in front of the company's station, and to go upon the plaintiff's depot grounds or into its station as well as to stand upon the sidewalk in front of the main entrance to the station for the purpose of soliciting the business of incoming or outgoing passengers.

A motion for an injunction against the defendants was heard upon the pleadings and upon affidavits filed by the respective parties. The Circuit Court granted a 'preliminary injunction to the effect that the defendants and all persons claiming to act under their authority, direction or control, or to whom notice of the court's order or injunction should come, refrain "from entering the passenger station of complainant at the corner of Adams and Canal streets in the city of Chicago, to solicit custom of the incoming passengers for cabs, carriages, express wagons or hotels, and do absolutely desist and refrain from congregating upon the sidewalk in front of, adjacent to or about such entrances to said passenger station and from soliciting the custom of passengers for cabs, carriages, express wagons or hotels until the further order of the court in the premises."

The defendants appealed from that order and it was affirmed in the Circuit Court of Appeals, except the last clause thereof, which was modified by restraining the defendants "from congregating upon the sidewalks in front of, adjacent to, or about the entrance of the appellee company's passenger station and from there soliciting the custom of passengers, *so as to interfere* with the ingress and egress of passengers and employés." *Donovan* v. *Pennsylvania Co.*, 120 Fed. Rep. 215. Subsequently, a final decree was passed in the Circuit Court in conformity with the above order of the Circuit Court of Appeals.

That decree, upon appeal by the defendants, was affirmed in the latter court and the case is now before this court upon writ of certiorari sued out by the defendants.

*Mr. Richard J. Cooney*, with whom *Mr. James R. Ward* was on the brief, for petitioners:

The petitioners are licensed hackmen and expressmen of the city of Chicago, and are common carriers of passengers and baggage and of express. They are carrying on their vocation under the ordinances of Chicago, and are governed by the municipal law of Chicago. Art. V, ch. 24, Hurd's Stat. Ill., p. 62, § 1, cls. 9, 42.

No corporation or individual can acquire an exclusive right to their use for merely private purposes, and the ordinance must be reasonable, not oppressive, or such as will create a monopoly or grant special privileges or are in their nature class legislation, and must not be against public policy; if so, they are void. The ordinances must operate impartially, and they cannot discriminate between the same class, and they must be uniform and apply to all alike. *Trotter* v. *Chicago*, 33 Ill. App. 206; *Chicago* v. *Trotter*, 136 Illinois, 430; *Chicago Dock Company* v. *Garrity*, 115 Illinois, 155; *Tugman* v. *Chicago*, 78 Illinois, 405; *Chicago* v. *Rumpff*, 45 Illinois, 90; *Kinmundy* v. *Mahan, et al.*, 72 Illinois, 462; *East St. Louis* v. *Wehrung*, 50 Illinois, 28; *Danville* v. *Noone*, 103 Ill. App. 290. See ordinances Rev. Code Chicago, § 498; *Lindsay* v. *Anniston*, 27 L. R. A. 436.

This being the case the use of the street with the consent and acquiescence of the municipal authorities cannot be enjoined at the suit of an abutting property owner. *Doane* v. *Elevated R. R. Co.*, 165 Illinois, 510; *Murphy* v. *Chicago*, 29 Illinois, 279; *Stetson* v. *Chicago &c. R. R. Co.*, 75 Illinois, 74; *Petterson* v. *Chicago &c. R. R. Co.*, 75 Illinois, 588; *Burlington & Q. R. R. Co.* v. *McGinniss*, 79 Illinois, 269; *Peoria & R. I. Co.* v. *Shertz*, 84 Illinois, 135; *Penn. L. Ins. Co.* v. *Heiss*, 141 Illinois, 35; *Corcoran* v. *Chicago and Madison R. R.*,

*Co.*, 149 Illinois, 291; *White* v. *Elevated R. R. Co.*, 154 Illinois, 620; *P. C. C. & St. L. Co.* v *Backus*, 154 U. S. 421; *Truesdale* v. *Grape Sugar Co.*, 101 Illinois, 561; *Dunning* v. *Aurora*, 40 Illinois, 480; *Bliss* v. *Kennedy*, 43 Illinois, 67; *White* v. *Elevated Railroad Co.*, 154 Illinois, 626; *County of Cook* v. *G. W. R. R. Co.*, 119 Illinois, 218; *Tibbets* v. *W. & St. Ry. Co.*, 54 Ill. App. 108; *Chicago* v. *Union Building Assn.*, 102 Illinois, 380; *Clark* v. *Donaldson*, 104 Illinois, 639; *Union Coal Co.* v. *La Salle*, 136 Illinois, 119; *Hessing* v. *Scott*, 107 Illinois, 600; *Miller* v. *Webster*, 62 N. W. Rep. 648. The above citations apply to corporations as well as private individuals. *Gen. Electric R. R. Co.* v. *Chicago St. R. R. Co.*, 66 Ill. App. 362; *Pennsylvania Co.* v. *Chicago*, 181 Illinois, 289; § 12, Art. II, Const. Illinois, 1870; Hurd's Stat., 1901, 72, 1385, 1378, 1381.

The ordinances of the city of Chicago passed in pursuance of the authority delegated to it by the legislative department of the State, have the effect of a statute passed by the general assembly. *Water Works* v. *New Orleans*, 164 U. S. 481.

The respondent in coming into the State of Illinois seeking to do business here, owes obedience to the constitution and the laws of the State, and the ordinances of the city of Chicago, enacted in pursuance thereof, and is answerable thereto for acts of nonfeasance or of misfeasance committed in said city. *St. Louis* v. *W. U. Tel. Co.*, 148 U. S. 102; *Chi. & Mil. Ry. Co.* v. *Sloan*, 169 U. S. 137.

To permit the respondent to exercise the power and privilege and enjoy an immunity denied to other common carriers, would be beyond the power of the general assembly and in violation of § 22, Art. IV, Illinois Constitution. *Noel* v. *The People*, 127 Illinois, 594; *Horwich* v. *Walker*, 205 Illinois, 495.

The title to the sidewalks and the fee of the streets and control thereof, at the entrance to and abutting the Union Passenger Station of the Pennsylvania Company, are vested exclusively in the city of Chicago, for public use. *Penn. Co.* v. *Chicago*, 181 Illinois, 296; *Barnes* v. *Dist. of Col.*, 91 U. S. 547.

The respondent devotes its property to a use in which the public has an interest, and subjects its property to be controlled by such regulations as may be "prescribed by law," by the legislative authorities of the State and the city. *Cutting* v. *Kansas City Stock Yards Co.*, 183 U. S. 84; *Brass* v. *Stoesser*, 153 U. S. 400; *Budd* v. *New York*, 143 U. S. 531; *Munn* v. *Illinois*, 94 U. S. 112; *I. C. R. R. Co.* v. *Willenborg*, 117 Illinois, 209.

The Pennsylvania Company could not lawfully under the constitution and laws of the State of Illinois, exclude from its station in Chicago, duly licensed cabmen, and so discriminate against them as to derive a profit from the maintenance of a monopoly given to the Parmelee Company. Neither is a court of equity open to the litigant whose acts are violations of law, and opposed to public policy and the organic and statute law of the State, and who seeks its sanction and aid to enforce a contract *ultra vires*, and maintain a monopoly. *Hack Company* v. *Sootsam*, 84 Michigan, 194; *Union R. Co.* v. *Langlois*, 9 Montana, 419; *McConnell* v. *Hays*, 92 Kentucky, 465; *Union Co.* v. *Dohn*, 153 Indiana, 10; *Cravens* v. *Rogers*, 101 Missouri, 246; *Lindsay* v. *Anniston*, 104 Alabama, 267.

The relation of carrier and passenger is not involved in this case, nor is it exercised upon this record, but the exercise of police power and the authority to prevent and regulate monopolies and regulate sidewalks and traffic on the same are involved, attributes of State's sovereignty which belong exclusively to the State and its political subdivisions and agents. *United States* v. *Knight*, 156 U. S. 11; *Barnes* v. *Dist. of Col.*, 91 U. S. 547; *Slaughter House Cases*, 16 Wall. 36, 63; *New York* v. *Miln*, 11 Pet. 139.

If respondent is injured, for which it has a right to complain, it has an adequate remedy at law, and where respondent has an adequate remedy at law relief in equity will not be granted. *Richards* v. *Lake Shore &c. Ry. Co.*, 124 Illinois, 516; *Railroad Co.* v. *Drake*, 148 Illinois, 226; *Railroad Co.* v. *Scott*, 132 Illinois, 429; *Railroad Co.* v. *Robbins*, 159 Illinois, 598;

*Gault* v. *Railroad Co.*, 157 Illinois, 125; *Rigney* v. *City of Chicago*, 102 Illinois, 64; *Railroad Co.* v. *Ayers*, 106 Illinois, 511; *Railroad Co.* v. *Reich*, 101 Illinois, 157; *Railroad Co.* v. *Stein*, 65 Illinois, 75; *Ottawa G. L. Co.* v. *Graham*, 28 Illinois, 73; *Railroad Co.* v. *Grabill*, 50 Illinois, 242.

Where the relief prayed for, if granted, would be of great injury to the petitioners and not of a corresponding benefit to the respondent, an injunction will be denied. *Pratt* v. *N. Y. C. R. R. Co.*, 35 N. Y. Supp. 577; *Gray* v. *Railroad Co.*, 126 N. Y. 509; High on Injunction, 596; *H. H. Co.* v. *Padell*, 5 Del. Ch. 435; *Fernes* v. *Railroad Co.*, 121 N. Y. 505; *Railroad Co.* v. *Adams*, 28 Florida, 656; *Ammerman* v. *Dean*, 132 N. Y. 355; *Interstate Com. Comm.* v. *Railroad Co.*, 64 Fed. Rep. 981; *Nason* v. *Sanborn*, 45 N. H. 171.

The outside facilities for hackmen at a depot must be equal; there can be no privileges shown there. *Godbout* v. *St. Paul Union Depot Co.*, 47 L. R. A. 532.

A railroad company or depot cannot make arbitrary rules discriminating as to who may occupy stands as provided by such depot, and as to who shall solicit passengers therefrom. Ray on Passenger Carriers, §§ 113–115; Fetter on Carriers of Passengers, vol. 1, § 245, p. 638; 26 Am. & Eng. Ency. of Law, 2d ed., 505; *Montana Union Ry. Co.* v. *Langlios*, 8 L. R. A. 753, and note citing authorities; *Markham* v. *Brown*, 8 N. H. 523; *Craven* v. *Rogers*, 42 Am. & Eng. Ry. Cas. 656; *Mariett* v. *Railroad Co.*, I. C. B. (N. S.) 499; *In re Palmer and Railroad Co.*, L. R., 6 C. P. 194; *Camblos* v. *Railway Co.*, 9 Philadelphia, 411; *Express Company* v. *Railroad Co.*, 57 Maine, 188; *Summitt* v. *State*, 8 Lea, 413; *Mississippi* v. *Reed*, 76 Mississippi, 211; *Indianapolis U. Ry. Co.* v. *Dohn*, 153 Indiana, 10; *Lucas* v. *Herbert*, 37 L. R. A. 376; *Cole* v. *Rowen*, 13 L. R. A. 848; *Indian River S. B. Co.* v. *East Coast Transpt. Co.*, 28 Florida, 387.

Equity should not aid the respondent in its unlawful design of giving the exclusive right at its depot to one common carrier to the exclusion of others and monopolize the business of carriage and appropriate a portion of the public thoroughfare and

quasi-public property to its own private use and the use of the Parmelee Transfer Company to the exclusion of other common carriers.

Mr. Edgar A. Bancroft, with whom Mr. Frank J. Loesch and Mr. Charles F. Loesch were on the brief, for respondent:

Cabmen and expressmen have no right to enter a railroad station, for the purpose of soliciting patronage there without the consent of the railroad company.

The stations, like the railroads, are impressed with a public use and are open to all having contractual relations with the company or its passengers; but this does not embrace the right to carry on any private business in any station or train without the consent of the company. It may grant an exclusive license to one person to solicit custom or incoming passengers in its station, and exclude all others from the like privilege. *Jencks* v. *Coleman*, 2 Sumn. 221; *Commonwealth* v. *Powers*, 7 Met. 596; *Barker* v. *Midland Ry. Co.*, 18 C. B. 46; *S. C.*, 86 E. C. L. R. 45; *Marriott* v. *London & S. W. R. Co.*, 1 C. B. (N. S.) 499; *S. C.*, 87 E. C. L. R. 498; *Beadell* v. *Eastern Counties Ry. Co.*, 2 C. B. (N. S.) 509; *S. C.*, 89 E. C. L. R. 509; *Painter* v. *London &c. Ry. Co.*, 2 C. B. (N. S.) 702; *S. C.*, 89 E. C. L. R. 701; *Barney* v. *D. R. Martin*, 11 Blatch. 534; *Barney* v. *Oyster Bay Steamboat Co.*, 67 N. Y. 301; *Express Cases*, 117 U. S. 1; *Old Colony R. Co.* v. *Tripp*, 147 Massachusetts, 35; *Commonwealth* v. *Carey*, 147 Massachusetts, 40; *Fluker* v. *Railroad Co.*, 81 Georgia, 461; *Griswold* v. *Webb*, 16 R. I. 649; *Chicago, St. L. & N. O. R. R. Co.* v. *Pullman Co.*, 139 U. S. 79; *Smith* v. *N. Y., L. E. & W.*, 149 Pa. St. 249; *N. Y. Cent. R. Co.* v. *Flynn*, 74 Hun, 124; *N. Y. Cent. R. Co.* v. *Sheeley*, 27 N. Y. Supp. 185; *Brown* v. *N. Y. Cent. Ry. Co.*, 75 Hun, 355; *S. C.*, 46 N. E. Rep. 1145; *Summitt* v. *State*, 76 Tennessee, 413; *Lucas* v. *Herbert*, 148 Indiana, 64; *N. Y. R. R. Co.* v. *Scoville*, 71 Connecticut, 136; *Snyder* v. *Union Depot Co.*, 19 Ohio Cir. Ct. Rep. 368; *Kates* v. *Cab Co.*, 107 Georgia, 636; *Godbout* v. *St. Paul Union Depot*, 79 Minnesota, 188; *N. Y.*

*Cent. R. Co.* v. *Warren*, 64 N. Y. Supp. 781; *Boston & Albany R. Co.* v. *Brown*, 177 Massachusetts, 65; *Boston & Me. R. Co.* v. *Sullivan*, 177 Massachusetts, 230; *N. Y. &c. R. Co.* v. *Bork*, 23 R. I. 218; *St. Louis Drayage Co.* v. *Louisville & Nashville R. Co.*, 65 Fed. Rep. 39; *Pennsylvania Co.* v. *Donovan*, 120 Fed. Rep. 215; *Hedding* v. *Gallagher*, 72 N. H. 377.

Respondent has the legal right to free and unobstructed entrance to its passenger station from Canal street; such right is a property right; and the obstruction of such entrance by the petitioners gathering there in large numbers to ply their vocation, is a private nuisance.

The allegations of respondent's bill are fully sustained by the proof. *Benjamin* v. *Storr*, L. R. 9 Com. Pl. 400; *Lyon* v. *Fishmongers Co.*, 1 App. Cases (H. L.), 662; *Fritz* v. *Hobson*, L. R. 14 Ch. Div. 542; *Jaques* v. *Natl. Exhibit Co.*, 15 Abb. N. C. 250; *Hallock* v. *Scheyer*, 33 Hun, 111; *Flynn* v. *Taylor*, 53 Hun, 167; *Callanan* v. *Gilman*, 107 N. Y. 360; *Cohen* v. *Mayor*, 113 N. Y. 532; *Flynn* v. *Taylor*, 127 N. Y. 596; *Carter* v. *Chicago*, 57 Illinois, 283; *Field* v. *Barling*, 149 Illinois, 557; *Newell* v. *Sass*, 142 Illinois, 104; *Hart* v. *Buckner*, 54 Fed. Rep. 925; *McDonald* v. *Newark*, 42 N. J. Eq. 136; 2 Dillon on Mun. Corp., 4th ed., § 587; and n. § 656a; 1 Lewis on Em. Domain, 2d ed., 170, 196; 1 Am. & Eng. Corp. Rep., 47; 1 Am. & Eng. Ency. of Law, 2d ed., 225, 238; Elliott on Roads, 2d ed., 761; *Branahan* v. *Hotel Co.*, 39 Ohio St. 333; *Lahr* v. *Met. El. R. Co.*, 104 N. Y. 268; *Hedding* v. *Gallagher*, 72 N. H. 377.

Injunction is the only adequate remedy in the case at bar. 1 Spelling on Injunctions, 2d ed., § 338; 2 Lewis on Eminent Domain, 2d ed., § 638; 1 High on Injunction, §§ 816, 820; Hilliard on Injunctions, 2d ed., § 328; 2 Dill. on Mun. Corp., 4th ed., § 661; Elliott on Roads, 2d ed., § 709; cases *supra* and *Pennsylvania Co.* v. *Chicago*, 181 Illinois, 289; *Carter* v. *Chicago*, 57 Illinois, 283; *Edwards* v. *Haeger*, 180 Illinois, 99, 108; *Lowery* v. *Pekin*, 186 Illinois, 387; *Chicago Gen. Elec. Ry. Co.* v. *C., B. & Q.*, 181 Illinois, 605, 611; *London & N. W. R. Co.* v. *Lancashire & Yorkshire Co.*, L. R. 4 Eq. Cases, 174, 178;

*N. Y. Cent. R. Co. v. Warren,* 64 N. Y. Supp. 781; *Goodson* v. *Richardson,* 9 Ch. App. 221; *Seattle Gas & Electric Co.* v. *Citizens Light & Power Co.,* 123 Fed. Rep. 588.

The cases cited by appellant can be distinguished and are inapplicable to the case at bar.

MR. JUSTICE HARLAN, after making the foregoing statement, delivered the opinion of the court.

As this case is before us on writ of certiorari, we can dispose of all questions arising on the record.

Upon the pleadings two principal inquiries arise: First, whether the Pennsylvania Company having made an arrangement with the Parmelee Transfer Company to furnish at its passenger station, from time to time, all vehicles necessary for the accommodation of passengers arriving there on its trains or on the trains of other railroad companies may legally exclude from its depot grounds or passenger station all hackmen or expressmen coming to either *for the purpose only* of soliciting for themselves the custom or patronage of passengers. Second, whether, in virtue of its ownership of the passenger station and depot grounds in question, the railroad company is entitled, in prosecuting its business, to any greater privileges in respect of the use of the sidewalk and street in front of the main entrance to such station, than belonged to the defendants in the prosecution of their business.

Much has been said in argument as to the functions and duties of railroad companies. Under the decisions of this court there can be no doubt as to the nature of those functions or duties. In *New Jersey Steam Navigation Co.* v. *Merchants' Bank,* 6 How. 344, 382, this court held that a corporation engaged, under legislative authority, in the transportation of passengers and freight over navigable waters, was "in the exercise of a sort of public office, and has public duties to perform." In *Olcott* v. *The Supervisors,* 16 Wall. 678, 694, 695, it was adjudged that a railroad, whether constructed by a private corporation or by individuals under the authority of a

legislative grant, or by the State itself, was a public highway, and that the function performed by the corporation was that of the State, and the uses to which its property was devoted were of a public nature.  In *Queensbury* v. *Culver,* 19 Wall. 83, 91, it was said that the construction or maintenance of a public highway was "for the promotion of a public use."  So in *Township of Pine Grove* v. *Talcott,* 19 Wall. 666, 676, which involved the validity of taxation, under legislative authority, to aid in the construction of a railroad by a corporation: "Though the corporation was private, its work was public, as much so as if it were to be constructed by the State."  Again, in *Cherokee Nation* v. *Kansas Railway Co.,* 135 U. S. 641, 657: "The question is no longer an open one, as to whether a railroad is a public highway, established primarily for the convenience of the people, and to subserve public ends, and, therefore subject to governmental control and regulation.  It is because it is a public highway, and subject to such control, that the corporation by which it is constructed, and by which it is to be maintained, may be permitted, under legislative sanction, to appropriate private property for the purposes of a right of way, upon making just compensation to the owner in the mode prescribed by law."  To the same effect are *United States* v. *Freight Association,* 166 U. S. 290, 332; *Smyth* v. *Ames,* 169 U. S. 466, 544; *Lake Shore &c. Ry.* v. *Ohio,* 173 U. S. 285, 301.  Necessarily, the same principles apply in reference to the use of the company's station house and depot grounds; for they are held in the same right as are its road, its locomotives and other property or appliances employed in the transportation of passengers and freight, and must be devoted primarily to public use to the extent necessary for the public objects intended to be accomplished by the construction and maintenance of the railroad as a highway.

It by no means follows, however, that the company may not establish such reasonable rules, in respect of the use of its property, as the public convenience and its interests may suggest, provided only that such rules are consistent with the

ends for which the corporation was created and not inconsistent with public regulations legally established for the conduct of its business. Although its functions are public in their nature, the company holds the legal title to the property which it has undertaken to employ in the discharge of those functions. And as incident to ownership it may use the property for the purposes of making profit for itself; such use, however, being always subject to the condition that the property must be devoted primarily to public objects, without discrimination among passengers and shippers, and not be so managed as to defeat those objects. It is required, under all circumstances, to do what may be reasonably necessary and suitable for the accommodation of passengers and shippers. But it is under no obligation to refrain from using its property to the best advantage of the public and of itself. It is not bound to so use its property that others, having no business with it, may make profit to themselves. Its property is to be deemed, in every legal sense, private property as between it and those of the general public who have no occasion to use it for purposes of transportation. In *Western Union Tel. Co.* v. *Pennsylvania R. R. Co. et al.*, 195 U. S. 540, the court considered the nature of the interest which a railroad company had in its right of way. It was there said: "A railroad's right of way has, therefore, the substantiality of the fee, and it is private property even to the public in all else but an interest and benefit in its uses. It cannot be invaded without guilt of trespass. It cannot be appropriated in whole or part except upon the payment of compensation. In other words, it is entitled to the protection of the Constitution, and in the precise manner in which protection is given." In that case the court referred, with approval, to the observation of the Supreme Court of Pennsylvania in *Philadelphia & Reading Railroad Co.* v. *Hummell*, 44 Pa. St. 375, to the effect "that a railway company is a purchaser, in consideration of public accommodation and convenience, of the exclusive possession of the ground paid for to the proprietors of it." So, in *Pittsburg,*

*Fort Wayne & Chicago Ry. Co.* v. *Bingham, Admx.*, 29 Ohio St. 364, 370, the Supreme Court of Ohio said that "for all purposes not connected with the operation of its road, the right of the company to the exclusive use and enjoyment of the corporate property is as perfect and absolute as is that of an owner of real property not burdened with public or private easements or servitudes."

Applying these principles to the case before us, it would seem to be clear that the Pennsylvania Company had the right—if it was not its legal duty—to erect and maintain a passenger station and depot buildings in Chicago for the accommodation of passengers and shippers as well as for its own benefit; and that it was its duty to manage that station so as to subserve, primarily, the convenience, comfort and safety of passengers and the wants of shippers. It was therefore its duty to see to it that passengers were not annoyed, disturbed or obstructed in the use either of its station house or of the grounds over which such passengers, whether arriving or departing, would pass. It was to that end—primarily as we may assume from the record—that the Pennsylvania Company made an arrangement with a single company to supply all vehicles necessary for passengers. We cannot say that that arrangement was either unnecessary, unreasonable or arbitrary; on the contrary, it is easy to see how, in a great city and in a constantly crowded railway station, such an arrangement might promote the comfort and convenience of passengers arriving and departing, as well as the efficient conduct of the company's business. The record does not show that the arrangement referred to was inadequate for the accommodation of passengers. But if inadequate, or if the Transfer Company was allowed to charge exorbitant prices, it was for passengers to complain of neglect of duty by the railroad company and for the constituted authorities to take steps to compel the company to perform its public functions with due regard to the rights of passengers. The question of any failure of the company to properly care for the convenience of passen-

gers was not one that, in any legal aspect, concerned the defendants as licensed hackmen and cabmen. It was not for them to vindicate the rights of passengers. They only sought to use the property of the railroad company to make profit in the prosecution of their particular business. A hackman, in nowise connected with the railroad company, cannot, of right and against the objections of the company, go upon its grounds or into its station or cars for the purpose simply of soliciting the custom of passengers; but, of course, a passenger upon arriving at the station, in whatever vehicle, is entitled to have such facilities for his entering the company's depot as may be necessary.

Here the defendants press the suggestion that they are entitled to the same rights as were accorded by special arrangement to the Parmelee Transfer Company. They insist, in effect, that as carriers of passengers they are entitled to transact their business at any place which, under the authority of law, is devoted primarily to public uses—certainly at any place open to another carrier engaged in the same kind of business. But this contention, when applied to the present case, cannot be sustained. The railroad company was not bound to accord this particular privilege to the defendants simply because it had accorded a like privilege to the Parmelee Transfer Company; for it had no contractual relations with the defendants, and owed them as hackmen no duty to aid them in their special calling. The defendants did not have or profess to have any business of their own with the company. In meeting their obligations to the public, whatever the nature of those obligations, the defendants could use any property owned by them, but they could not, of right, use the property of others against their consent. In maintaining a highway, under the authority of the State, the first and paramount obligation of the railroad company was, as we have already said, to consult the comfort and convenience of the public who used that highway. To that end it could use all suitable means that were not forbidden by law. In its discretion it

could accept the aid or stipulate for the services of others. But, after providing fully for the wants of passengers and shippers, it did not undertake, expressly or by implication, to so use its property as to benefit those who had no business or connection with it.   It is true that by its arrangement with the railroad company the Parmelee Company was given an opportunity to control, to a great extent, the business of carrying passengers from the Union Passenger Station to other railway stations and to hotels or private houses in Chicago. But in a real, substantial, legal sense, that arrangement cannot be regarded as a monopoly in the odious sense of that word, nor does it involve an improper use by the railroad company of its property.   That arrangement is to be deemed, not unreasonably, a means devised for the convenience of passengers and of the railroad company, and as involving such use by the company of its property as is consistent with the proper performance of its public duties and its ownership of the property in question.   If the company by such use of its property also derived pecuniary profit for itself, that was a matter of no concern to the defendants and gave them no ground of complaint.

This question is not controlled by any statute of Illinois. Reference has been made to the Illinois act as amended in 1883, by which it is provided that every railroad in that State shall "at all junctions with other railroads, and at all depots where said railroad companies stop their trains regularly to receive and discharge passengers in cities and villages, for at least one-half hour before the arrival of, and one-half hour after the arrival of any passenger train, cause their respective depots to be open for the reception of passengers; said depots to be kept well lighted and warmed for the space of time aforesaid;" also, to the act of 1877, as amended in 1895, by which it is provided, "That all railroads in this State carrying passengers or freight shall, and they are hereby required to build and maintain depots for the comfort of passengers and for the protection of shippers of freight, where such railroad

companies are in the practice of receiving and delivering passengers and freight, at all towns and villages, having a population of two hundred or more on the line of their roads, and roads leased and operated by them." Hurd's Ill. Stat., 1901, pp. 1385, 1378. Clearly these statutes have nothing to do with the matter before us. They relate only to the comfort and convenience of passengers and shippers of freight, and do not confer or assume to confer any rights on hackmen or cabmen who seek to enter the depot grounds and station of the railroad company merely to solicit business for themselves. It does not appear that the State has undertaken by any statute to compel the railroad company to share the use of its depot grounds and station with hackmen and cabmen seeking to use them only to solicit custom for themselves. Whether such a statute would be valid, we need not now consider or determine.

In the *Express Cases*, 117 U. S. 1, 24, which involved a general inquiry as to the respective rights of railroad and express companies in respect of the use of railroads for the transportation of express parcels, this court said: "So long as the public are served to their reasonable satisfaction, it is a matter of no importance who serves them. The railroad company performs its whole duty to the public at large and to each individual when it affords the public all reasonable express accommodations. If this is done, the railroad company owes no duty to the public as to the particular agencies it shall select for that purpose. The public require the carriage, but the company may chose its own appropriate means of carriage, always provided they are such as to insure reasonable promptness and security."

In *Chicago &c. Railroad Co. v. Pullman Car Co.*, 139 U. S. 79, 89, one of the questions was as to the validity of a contract between a railroad company and the Pullman Company, whereby the latter was given the exclusive right for fifteen years to furnish drawing room and sleeping cars to be used by the former, and whereby, also, the railroad company stipu-

lated that during that term it would not contract to give a like privilege to other sleeping car companies. That contract was assailed as one in restraint of trade and as being against public policy. This court said: "The authorities cited in support of this contention have no application to such a contract as the one before us. The defendant was under a duty arising from the public nature of its employment to furnish for the use of passengers on its lines such accommodations as were reasonably required by the existing conditions of passenger traffic. Its duty, as a carrier of passengers, was to make suitable provisions for their comfort and safety. Instead of furnishing its own drawing room and sleeping cars, as it might have done, it employed the plaintiff, whose special business was to provide cars of that character, to supply as many as were necessary to meet the requirements of travel. It thus used the instrumentality of another corporation in order that it might properly discharge its duty to the public. So long as the defendant's lines were supplied with the requisite number of drawing room and sleeping cars, it was a matter of indifference to the public who owned them. *Express Cases,* 117 U. S. 1."

The views we have expressed find more or less support in numerous adjudged cases, some of which are cited in the margin.[1] There are cases to the contrary, but in our opinion the better view, the one sustained by the clear weight of

---

[1] *Jencks* v. *Coleman,* 2 Sumn. 221; *Barney* v. *The Martin,* 11 Blatch. 233; *Commonwealth* v. *Power,* 7 Met. 596; *Barney* v. *Oyster Bay Steamboat Co.,* 67 N. Y. 301; *Old Colony R. R. Co.* v. *Tripp,* 147 Massachusetts, 35; *Commonwealth* v. *Carey,* 147 Massachusetts, 40; *State* v. *Depot Co.,* 71 Ohio St. 379; *Norfolk & Western Ry. Co.* v. *Old Dominion Baggage Co.,* 99 Virginia, 111; *Fluker* v. *Georgia Railroad Co.,* 81 Georgia, 461; *Griswold* v. *Webb,* 16 R. I. 649; *Summitt* v. *State,* 76 Tennessee, 413; *New York &c. R. R. Co.* v. *Scovill,* 71 Connecticut, 136; *Kates* v. *Cab Co.,* 107 Georgia, 636; *Godbout* v. *St. Paul Union Depot,* 79 Minnesota, 188; *Boston & Albany R. R. Co.* v. *Brown,* 177 Massachusetts, 65; *Boston & Maine R. R. Co.* v. *Sullivan,* 177 Massachusetts, 230; *New York &c. R. R. Co.* v. *Bork,* 23 R. I. 218; *St. Louis Drayage Co.* v. *Louisville &c. R. R. Co.,* 65 Fed. Rep. 39; *Hedding* v. *Gallagher,* 72 N. H. 377.

authority and by sound reason and public policy, is that which
we have expressed.

The defendants cite, as supporting their contention, *Pennsylvania Company* v. *Chicago*, 181 Illinois, 289. But that case
did not involve any question as to the right of licensed cabmen
to enter the station house of a railroad company, against its
objection, solely for the purpose of soliciting the custom of
passengers. What appears in the opinion of the majority
and in the particular cases cited by the learned state court,
on that point was, we feel constrained to say, outside of the
issues presented, and cannot be deemed authoritative upon
the question now being considered. The sole issue in that
case was as to the validity of certain ordinances of the city
of Chicago relating to the use by hackmen of the public street
and sidewalk in front of the company's station—a question
wholly different from the one relating to the special arrangement between the railroad company and the Parmelee Transfer Company. If the question had been before the state court,
and it had adjudged that a railroad corporation could not
grant to one person or company the exclusive right within its
station to solicit the custom of passengers (the subject not
being covered by any valid statute), then it would have been
necessary to consider whether the subject was not one of general law, in respect of which the courts of the United States
were entitled to exercise their independent judgment in light
of the settled principles that must always control the determination of the legal rights of parties. No such question is
now presented.

The next question to be examined is that which involves
the respective rights of the parties in the use of the public
street and sidewalk in front of the company's passenger station.

We have seen that the original temporary restraining order
of the Circuit Court was, in general terms, to the effect that
the defendants desist from congregating upon the sidewalk
in front of, adjacent to or about the entrance to the company's
passenger station, and from soliciting the custom of passengers

for cabs, etc., until the further order of the court; and that this order was so modified in the Circuit Court of Appeals as to restrain only *such congregating* by defendants upon the sidewalk *as would interfere* with the ingress and egress of passengers and employés. We take it that the final decree recognized the right of the defendants in prosecuting their business to congregate, in reasonable numbers, upon the sidewalks in front of, adjacent to or about the entrance of the company's station, and from there soliciting the custom of passengers, provided such use of the sidewalks did not obstruct the ingress and egress of passengers and employés.

As the railroad company did not appeal from the final decree of the Circuit Court, it cannot upon this appeal complain of any of its provisions. The defendants did appeal, and they object to the decree relating to the use of the sidewalk and street in front of the main entrance to the passenger depot.

That the railroad company by its agents and employés is entitled, in prosecuting its business, to use, in all appropriate ways, the sidewalk and street in front of its station and depot grounds, cannot be doubted—that right being appurtenant to the lands upon which its station house and depot grounds stand. Passengers may, therefore, in their own right, as well as in right of the company, use the sidewalk in order to gain access to the depot grounds and station, or to reach the public street when leaving the station.

Referring to the rights of abutting owners, the Supreme Court of Illinois, in *Field* v. *Barling*, 149 Illinois, 556, 571, said: "The dedication of the street by the plat, the sale of lots with reference to it, conveyance of abutting lots and the payment of the money for the conveyances, were elements sufficient to create the right. The right may be regarded in the nature of an incorporeal hereditament. It becomes appurtenant to the lots. As to rights secured they are plain; to have the street kept open, so that free access may be had to and from the lots abutting on the street." In the later case of *Pennsylvania Company* v. *Chicago*, 181 Illinois, 289, above

cited, that court adjudged that the title to the streets in Chicago was vested in the city, and "it has the conservation, control, management and supervision of such trust property, and it is its duty to defend and protect the title to such trust estate. The city has no power or authority to grant the exclusive use of its streets to any private person or for any private purposes, but must hold and control the possession exclusively for public use, for purposes of travel and the like." The general doctrine is correctly stated in Dillon on Municipal Corporations: "For example, an abutting owner's right of access to and from the street, subject only to legitimate public regulation, is as much his property as his right to the soil within his boundary lines. When he is deprived of such right of access, or of any other easement connected with the use and enjoyment of his property, other than by the exercise of legitimate public regulation, he is deprived of his property." Again: "But it was further seen that he had rights not shared by the public at large, special and peculiar to himself, and which arose out of the very relation of his lot to the street in front of it, and that these rights, whether the bare fee of the streets was in the lot owner or in the city, were rights of property, and as such ought to be and were as sacred from legislative invasion as his right to the lot itself." 2 Dill. Mun. Corp., 4th ed., §§ 587b, 656a. So, in Lewis on Eminent Domain, where the adjudged cases are referred to and examined: "When the owner of a tract of land lays the same out into lots and streets and sells the lots, the purchasers of such lots acquire as appurtenant thereto a private right of way and access over the streets. This private right arises without an express grant and in the absence of any statute. The law presumes that the parties had in mind the advantages to be derived from the use of the proposed streets, and implies a right to such use as a part of the grant. . . . Therefore, in the case of such a grant, there arises by operation of law a private right to use the streets in connection with the lots of each proprietor, which is as inviolable as any other right of property. . . . The existence of these private rights

and easements is, therefore, entirely independent of the mode in which the highway is established, or of the estate or interest which the public acquires in the soil of the street, whether a fee or less." Lewis on Eminent Domain, 2d ed., § 91*f* and authorities cited in notes. See, also, *Newell* v. *Sass*, 142 Illinois, 104.

But the right of the railroad company, as abutting owner and the rights of passengers are not, in their nature, paramount to the rights of others of the general public to use the sidewalk in question in legitimate ways and for legitimate purposes. Licensed hackmen and cabmen, unless forbidden by valid local regulations, may, within reasonable limits, use a public sidewalk in prosecuting their calling, provided such use is not materially obstructive in its nature, that is, of such exclusive character as, in a substantial sense, to prevent others from also using it upon equal terms for legitimate purposes. Generally speaking, public sidewalks and streets are for use by all, upon equal terms, for any purpose consistent with the object for which such sidewalks and streets are established; subject of course to such valid regulations as may be prescribed by the constituted authorities for the public convenience; this, to the end that, as far as possible, the rights of all may be conserved without undue discrimination.

By the Illinois statutes it is provided that the city council in cities may regulate the use of streets and sidewalks, and license, tax and regulate hackmen, omnibus drivers, carters, cabmen, porters, expressmen and all others pursuing like occupations, and to prescribe their compensation. Hurd's Ill. Stat. 1901, pp. 285, 287. And by ordinance of the city council of Chicago it is provided that "any licensed hackney, coach, cab or other vehicles for the conveyance of passengers, may stand, while waiting for employment at the following places, and for the period of time hereinafter provided: . . . Stand No. 4. The east side of Canal street, occupying one hundred and ten feet between Adams and Madison streets, as the superintendent of police shall direct. . . . Stand No. 6.

At all railroad depots ten minutes previous to the arrival of all passenger trains." Rev. Code of Chicago, § 498. The validity of this ordinance has been sustained by the Supreme Court of Illinois. *Pennsylvania Co.* v. *Chicago,* 181 Illinois, 289. Perceiving nothing in the above provisions inconsistent with any right secured by the Constitution of the United States, we accept the decision of the state court as authoritative upon this point. When, therefore, licensed hackmen and cabmen, at appropriate times, placed their vehicles in the public street, next to the sidewalk, in front of the company's passenger house, they did not violate the regulations established by the city council. Nor, so far as the plaintiff is concerned, did they violate such regulations, when, leaving their vehicles in the public street, at the appointed places, they stood near by them for a reasonable time upon the sidewalk awaiting the coming of passengers from the station house. What they could not legally do—what the final decree properly forbade them to do —was to *congregate* upon the sidewalk in front of, adjacent to or about the passenger house, *so as to interfere* with the ingress and egress of passengers. Of course, any use of the sidewalk in whatever way that would unnecessarily or unduly obstruct and interfere with passengers in their going or coming would be inconsistent with the rights of such passengers, as well as an infringement of the right of the company as abutting property owner to have, by its agents and employés, for the purposes of its business, reasonable access to and from the sidewalk and the public street.

It only remains to inquire as to the competency of a court of equity to give the railroad company the relief it sought. The defendants insist that equity cannot properly interfere. But the inadequacy of a legal remedy in such a case as this one is quite apparent. According to the record the attempt of the defendants, despite the objections of the company, to use its station house and depot grounds for the purpose of meeting passengers and soliciting their patronage, was of constant, daily, almost hourly occurrence. The case was one of a con-

tinuing trespass, involving injury of a permanent nature. A suit at law could only have determined the particular wrong occurring on a particular occasion, and would not reach other wrongs of like character that would occur almost every hour of each day, as passengers arrived at the station of the company. The same state of things existed in reference to such use of the sidewalk in front of the passenger station as unduly interfered with the rights of passengers arriving and departing. Only a court of equity was competent to meet such an unusual emergency, and by a comprehensive decree determine finally and once for all the entire controversy between the parties—thus avoiding a multiplicity of suits and conserving the public interests. No remedy at law would be so complete or efficacious as a suit in equity in such a case as this one. *Coosaw Mining Co.* v. *South Carolina,* 144 U. S. 550; *Smyth* v. *Ames,* 169 U. S. 466, 517. The Supreme Court of Illinois well said in *Chicago General Ry. Co.* v. *C., B. & Q. R.,* 181 Illinois, 605, 611: "When irreparable injury is spoken of it is not meant that the injury is beyond the possibility of repair, or beyond the possibility of compensation in damages, but it must be of such constant and frequent recurrence that no fair or reasonable redress can be had therefor in a court of law." See also *Newell* v. *Sass,* 142 Illinois, 104, 115, 116; *Carpenter* v. *Capital Electric Co.,* 178 Illinois, 29, 36; *Lowery* v. *Pekin,* 186 Illinois, 387, 398.

The decree of the Circuit Court of Appeals is

*Affirmed.*