## MIDSTATE MEDICAL CENTER *v.* JANE DOE

Superior Court, Judicial District of New Haven at Meriden
File No. CV-06-4005623S

Memorandum filed May 3, 2006

*O'Brien, Tanski & Young, LLP*, for the plaintiff.

*Jane Doe*, pro se, the defendant.

SHLUGER, J. The plaintiff, Midstate Medical Center (Midstate), initiated the present action by way of an application for a temporary injunction and a permanent injunction dated March 14, 2006, and filed with the court on March 17, 2006. The defendant was served in hand on March 14, 2006. The parties appeared as summoned on April 17, 2006, at which time the case was continued for a hearing specially assigned for April 19, 2006. The defendant filed a pro se appearance. The plaintiff, in an effort to protect the privacy and medical history relative to the defendant, had requested and received permission to refer to the defendant as Jane Doe.

The plaintiff alleged that it is an acute care facility hospital licensed for the practice of medicine in Meriden. It alleged that the defendant was admitted on or about January 3, 2006, as a patient for care relating to bilateral gangrene to her feet. The plaintiff further alleged that the patient care continued to a point where she was deemed stable for a transfer to a subacute care facility or to her home but that the defendant refused to cooperate with the transfer, refused to abide by the plaintiff's rules and regulations and refused to leave the plaintiff's facility. The plaintiff alleged that as a result, it was forced to squander scarce medical resources for a patient whose needs could be adequately met at a subacute care facility or at her home with the assistance of visiting nurses. It alleged that as a result of the defendant's presence at the plaintiff's facility, other patients in need of acute medical care had to be refused treatment there or transferred elsewhere. The plaintiff also alleged that in January, February and March, 2006, the

number of patients admitted to the plaintiff exceeded its authorized capacity. The defendant did not file a responsive pleading.

## I

## WITNESSES

The plaintiff presented five witnesses in support of its claims.

Rosamond Everard testified that she is a physician employed at the plaintiff's facility and had been involved in the care of the defendant since her admission on January 3, 2006. Everard testified that the defendant's admitting diagnosis was bilateral gangrene to both feet, complicated by a history of diabetes and nutritional issues. She testified that on or before February 18, 2006, the plaintiff's medical condition was stabilized and that she was medically able to be discharged to a subacute care facility (commonly referred to as a convalescent home or nursing home) or to the defendant's home. She testified that in fact, the plaintiff issued a discharge summary on March 8, 2006, indicating that the defendant was stable but would need limited nursing assistance that could be provided at a subacute care facility or at her home.

Karen Darley testified that she is a licensed clinical social worker employed at the plaintiff's facility and that she has been providing care to the defendant. She testified that on various dates in January and February, 2006, she had been advised by the treating surgeon, Aurangzeb Ali, that the defendant was an appropriate candidate for discharge to a subacute care facility and that she initiated the process for discharge. She testified that she attempted to place the defendant at several acute care facilities, such as Gaylord Hospital, The Rehabilitation Hospital of Connecticut or The Hospital For Special Care, but that these facilities refused to

accept the defendant because the defendant does not presently meet their criteria of requiring acute care. She testified that these acute care facilities will not admit a patient with the defendant's needs, as those needs can be adequately met at a subacute care facility or at the defendant's home. She further testified that the defendant had consented to such a transfer, had been accepted, but then changed her mind and now refuses to go to a subacute care facility, thus blocking any possible transfer. She testified that the defendant is very demanding, very difficult, uncooperative and refuses to abide by many of the plaintiff's rules. She testified that the defendant had, on various occasions, ordered in Chinese food, pizza and brought in donuts from Dunkin Donuts, all contrary to medical advice, against the plaintiff's rules and inconsistent with her strict dietary needs. She further testified that the defendant underwent two psychiatric evaluations during her stay and was found to be competent.

Abey Bruce testified that she is a registered nurse and the director of cancer care and in-patient surgical services at the plaintiff. She reiterated Darley's testimony and described the defendant as difficult, disruptive and uncooperative.

Joseph Plunt testified that he is a security officer for the plaintiff and that on or about March 30, 2006, he discovered the defendant in the hospital kitchen walk-in cooler, sneaking and eating desserts. He testified that this area is off limits for nonemployees and that as a result, he reported the incident and escorted the defendant back to her room.

Linda Berger Spivak testified that she is the plaintiff's vice president for patient care. She reiterated the need for the defendant's bed, that the plaintiff was over its authorized capacity and that as a result, it is being forced to send patients in need of acute care to other

facilities, although they would normally have been served by the plaintiff. She further testified that the defendant had rescinded her medical authorization form, thus, preventing the plaintiff from releasing her medical records to any other facility in an effort to place her in another facility.

The defendant testified that she understands that her doctors believe that she no longer requires the care of an acute care hospital. She testified that in years past, she had been a patient at several different subacute care facilities (nursing homes) and would not go back now. She testified that she believes that such care is geared for older people, who are often mistreated. Although she admitted that she herself was never a subject of the mistreatment that she observed with other patients, she adamantly refused to consider a transfer to such a facility. She testified that she would willingly be transferred to her home, but in that event she would require the care of nurse's aides for four to six hours per day to help her with her daily living activities, as she had enjoyed prior to her hospital admission in January. She also testified that she has wounds on her sacrum and that a more skilled nurse would be required to assist her with the changing of those bandages two times per day. She testified that she lives alone and has no family, but that she has neighbors with whom she is close who have always served as a support system.

In response to the questions about whether a transfer to her home would be agreeable, Darley, the licensed clinical social worker, was further questioned regarding the feasibility of such a transfer. Darley testified that such a transfer would require coordination of several social and medical services, including the procurement and delivery of a special bed to the plaintiff's home, which would take just a few days, the coordination with the department of social services to provide aides, which could take two weeks, and the setting up of home

care by way of New England Home Care, or a like agency, which would take a few days.

The defendant indicated her willingness to return to her home if these services could be put in place.

## II

## FINDINGS OF FACT

The court makes the following thirteen findings of fact. First, the plaintiff, Midstate Medical Center, is an acute care facility operating a hospital in Meriden. Second, the plaintiff has 124 hospital beds. Third, on January 3, 2006, the defendant, Jane Doe, was admitted to the hospital with a diagnosis of bilateral gangrene of her feet. Fourth, the patient's medical condition improved to a point where she was medically discharged on March 8, 2006. Fifth, that medical discharge permitted her to return home or to a subacute care facility. Sixth, her present medical condition necessitates nutritional and diabetic assistance, the changing of bandages two times per day, a special bed and the care of nurse's aides for four to six hours per day. Seventh, there presently exists no medical necessity for the defendant to reside at the plaintiff, and she is mentally competent. Eighth, the defendant's refusal to be transferred to a subacute care facility, i.e., a nursing home or convalescent home, is based on her personal belief that such care is more suited to old people and that it is distasteful to her. Ninth, the patient cannot be admitted to an acute care facility, such as The Hospital for Special Care, Gaylord Hospital or The Rehabilitation Hospital of Connecticut, as she does not meet their strict medical criteria. Tenth, the defendant has rescinded all medical authorizations that would facilitate and permit the plaintiff to transfer her records, a necessary step toward transferring her to a subacute care facility. Eleventh, the defendant's continued presence at the plaintiff makes her bed unavailable to more

seriously ill patients. Twelfth, as a result of the defendant's presence at the plaintiff, the plaintiff has had to turn away more seriously ill patients, resulting in a squandering of scarce medical resources. Thirteenth, and finally, there exists no legitimate, justifiable reason for the defendant to remain at the plaintiff, and the plaintiff has complied with all the proper procedures to discharge the patient to a subacute care facility or to her home.

## III

## LEGAL AUTHORITY

The standard for granting a temporary injunction is well settled. "In general, a court may, in its discretion, exercise its equitable power to order a temporary injunction pending final determination of the order, upon a proper showing by the movant that if the injunction is not granted he or she will suffer irreparable harm for which there is no adequate remedy at law." *Moore* v. *Ganim*, 233 Conn. 557, 569 n.25, 660 A.2d 742 (1995). A party seeking injunctive relief must demonstrate that (1) it has no adequate remedy at law; (2) it will suffer irreparable harm absent an injunction; (3) it will likely prevail on the merits; and (4) the balance of equities tips in its favor. *Waterbury Teachers Assn.* v. *Freedom of Information Commission*, 230 Conn. 441, 446, 645 A.2d 978 (1994).

"The plaintiff seeking injunctive relief bears the burden of proving facts which will establish irreparable harm as a result of that violation." *Karls* v. *Alexandra Realty Corp.*, 179 Conn. 390, 401, 426 A.2d 784 (1980). Moreover, "[t]he extraordinary nature of injunctive relief requires that the harm complained of is occurring or will occur if the injunction is not granted. Although an absolute certainty is not required, it must appear that there is a substantial probability that but for the

issuance of the injunction, the party seeking it will suffer irreparable harm." Id., 402.

The plaintiff has satisfied all four of the aforementioned criteria necessary to justify a temporary injunction.

Regarding the first element of a temporary injunction, the plaintiff has no adequate remedy at law. A civil action for money damages would be inadequate and inappropriate to remedy the ongoing harm the plaintiff has demonstrated by the loss of these scarce medical resources.

Second, the plaintiff argues that the actions of the defendant are causing an immediate and irreparable harm for which no other adequate remedy at law exists. The irreparable harm claimed and proven is the loss of the hospital bed that could be utilized by someone in need of acute medical care, the overcrowding of the plaintiff's facility and the transfer of or refusal of care to other patients.

Fourth, in determining whether an injunction should be issued, a court must balance the competing interests of the parties to ensure that the relief contemplated is equitable. *Waterbury Teachers Assn.* v. *Freedom of Information Commission,* supra, 230 Conn. 446. An injunction under these circumstances would allow the plaintiff to provide care for more seriously ill patients and permit it to utilize scarce medical resources better. There has been no medical evidence whatsoever to support the claim that the defendant should not be transferred to a subacute care facility or to her home. The care she continues to require includes social and dietary needs, a changing of bandages to her sacrum and general housekeeping, which can more than adequately be provided by way of visiting nurses as had been provided prior to her January 3, 2006 admission. The court finds that the defendant has been restored

to the level of health she enjoyed when she was living independently in her apartment, which is presently vacant and awaiting her return. On balance, the plaintiff's legitimate interest of allocating scarce medical resources to the best use outweighs the defendant's personal reluctance to be transferred to a nursing home or to her home.

There is no Connecticut authority directly on point; however, courts have routinely issued injunctions against continuing acts of trespass. See *More* v. *Urbano*, 151 Conn. 381, 198 A.2d 211 (1964); *Taylor* v. *Conti*, 149 Conn. 174, 177 A.2d 670 (1962).

A New York court addressed a nearly identical situation in *Wyckoff Heights Medical Center* v. *Rodriguez*, 191 Misc. 2d 207, 741 N.Y.S.2d 400 (2002). In that case, the patient of the hospital had been medically stabilized and discharged but refused to leave. The court granted an injunction, finding that "[h]ospitals have a duty not to permit their facilities to be diverted to uses for which hospitals are not intended . . . . Thus, the very utility of a hospital is in jeopardy where a patient that no longer requires services refuses to leave thereby preventing other needy patients from space and inpatient care. A remedy in damages does not suffice since it does not correct the underlying problem posed by the patient's intransigence . . . . This drastic remedy is demanded by the drastic conduct of the patient and the fact that no other remedy is adequate. Therefore, where a hospital complies with statutory and administrative guidelines governing the discharge of patients then a failure of the patient to comply may result in a mandatory injunction requiring such patient to leave." (Citations omitted; internal quotation marks omitted.) Id., 209. The court found that the patient's hospitalization was no longer medically necessary and that an appropriate discharge had been established. Because the patient could be adequately cared for either at a sub-

acute care facility or in his home with proper in-home care, that relief was granted. Id., 210.

The court, in *Jersey City Medical Center* v. *Halstead*, 169 N.J. Super. 22, 404 A.2d 44 (1979), similarly addressed an issue involving a patient, medically cleared for discharge, who would not leave the hospital. The court found that the bed space at this acute care facility was at a premium and that "[a hospital] has a moral duty to reserve its accommodations for persons who actually need medical and hospital care and it would be a deviation from its purposes to act as a nursing home for aged persons who do not need constant medical care but who need nursing care. . . . Hospitals have a duty not to permit their facilities to be diverted to the uses for which hospitals are not intended." (Internal quotation marks omitted.) Id., 24. The court went further and found that "[the hospital] owes a duty to the public which it serves to take all steps necessary to insure that adequate care is available to those in need of it, and this includes the removal of patients no longer in need of medical care." Id., 25. The court, in *Lucy Webb Hayes National Training School* v. *Geoghegan*, 281 F. Sup. 116 (D.D.C. 1967), went still further and determined that the patient, once medically discharged and no longer in need of hospital care, had become a trespasser due to her failure to vacate. "It has been established for a great many years that equity will enjoin a continuing trespass or a series of repeated trespasses where an action for damages would not be an adequate remedy. There is a leading English case on that point, *London & Northwestern Railway Co.* v. *Lancashire & Yorkshire Railway Co.*, [L.R. 4 Eq. Cases] 174, 179. The Supreme Court has approved and enforced this doctrine on many occasions, *Watson* v. *Sutherland*, [72 U.S. 74, 79], 18 L. Ed 580 [1867]; *Donovan* v. *Pennsylvania Co.*, 199 U.S. 279, 304, 26 S. Ct. 91, 50 L. Ed. 192 [1905]; *Archer* v. *Greenville Sand & Gravel Co.*, 233

U.S. 60, 65, 34 S. Ct. 567, 58 L. Ed. 850 [1914]. Various other Federal courts have applied the same doctrine, *F. Burkart Mfg. Co.* v. *Case*, 39 F.2d 5, 7 [(8th. Cir. 1930)]; *Swan Island Club,* [*Inc.*] v. *Ansell*, 51 F.2d 337, 339 [4th Cir. 1931], where Judge Chesnut stated, '[i]t is thoroughly well established that equity does have jurisdiction to restrain repeated and continuing [trespasses' and *United States* v. *Colvard*, 89 F.2d 312, 314 (4th Cir. 1937), in which] Judge Parker, an eminent jurist, stated, '[i]t is, of course, well settled that injunctive relief is proper against continuing trespass or against repeated trespasses where there is a threat of continuance and the remedy at law is inadequate or a multiplicity of suits would be avoided by the equitable remedy.' The Court of Appeals of New York State in *Wheelock* v. *Noonan*, 108 N.Y. 179, [186] 15 N.E. 67 [1888], stated, '[i]t has very often been held that [while ordinarily], courts of equity will not wield their power merely to redress a trespass, yet they will interfere under peculiar circumstances, and have often done so where the trespass was a continuing one, and a multiplicity of suits at law was involved in the legal remedy.' " *Lucy Webb Hayes National Training School* v. *Geoghegan*, supra, 117–18.

In addition to these several cases, there is a treatise in support of the plaintiff's position. 2 A. Capron & I. Birnbaum, Treatise on Health Care Law (2d Ed. 2005) § 11.03, p. 11.18, states: "[O]nce the hospital has determined that a patient's discharge or transfer is medically indicated, the patient has no right to remain at the hospital. In some jurisdictions, the hospital may seek to remove the patient as a trespasser. A North Carolina statute even deems a patient's refusal to leave the property to be criminal trespass . . . . The hospital may also pursue civil injunctive relief in the form of an eviction order or ejectment."

Under Connecticut law, General Statutes § 53a-108 (a) provides: "A person is guilty of criminal trespass in

the second degree when, knowing that he is not licensed or privileged to do so, he enters or remains in a building."

## IV

## ORDER

It is the order of the court that the defendant, Jane Doe, shall desist and refrain, until further order of this court, from refusing to cooperate and refusing to be discharged to a subacute care facility in the state of Connecticut that has a bed for her. The defendant shall sign all necessary papers to effect a transfer that is appropriate and will accept a discharge and transfer to a facility that accepts her. In the alternative, the defendant shall be discharged to her last known residence, or another address in the state of Connecticut that she provides prior to the execution of discharge by the plaintiff.

Thereafter, should the defendant in the future, present herself for care at the plaintiff's facility, she shall not do so unless she is in need of acute medical care. If and when such event occurs, it is ordered that when it is determined that the defendant is medically stable and an appropriate candidate for transfer to a subacute care facility or to her home after this or any future hospitalization, that she be restrained from failing to cooperate with that transfer.