Mader v. City of Topeka.

No. 22,919.

AUGUST M. MADER, *Petitioner*, v. THE CITY OF TOPEKA et. al., *Respondents.*

SYLLABUS BY THE COURT.

1. CITY ORDINANCE—*Licensing Taxicab Drivers.* A city ordinance is not void because it grants a license to one and denies it to another, where the grant and the restriction are in the interest of the public.

2. SAME—*Relating to Taxicab Stands in Front of Private Property.* A city ordinance which in effect grants special permit to licensed hack drivers who can procure the consent of the abutting property owners, to stand their vehicles in the street in front of such property is not unconstitutional on the ground that it grants special privileges, although the same privilege is not granted to those who do not obtain such consent.

3. SAME—*Exclusive Privilege to Hackmen to Go Upon Railroad Property to Solicit Business.* A railway company may grant an exclusive privilege to one and exclude all others who desire to go upon its premises for the sole purpose of soliciting customers or business.

Original proceeding in habeas corpus. Opinion filed May 8, 1920. Writ denied.

*Edwin D. McKeever,* of Topeka, for the petitioner.

*D. H. Branaman,* city attorney, for the respondents.

The opinion of the court was delivered by

PORTER, J.: The petitioner operates a taxicab for hire upon the public streets of the city of Topeka, and seeks his release from imprisonment upon a conviction for the violation of a city ordinance, claiming that the ordinance is unconstitutional.

The ordinance, No. 4951, enacted by the Board of Commissioners of the City of Topeka, was published on March 17, 1920. The question turns upon the validity of section 9, which reads:

"It shall be unlawful for the owners or driver of any hackney carriage, taxicab, auto bus, baggage wagon, truck, or any other passenger or baggage vehicle to stand any such vehicle or solicit business on any public street, alley or sidewalk in the City of Topeka, without the owner of such vehicle having first obtained and filed with the City Clerk of said city the written consent of the owner or of the person, corporation or company, having control of the abutting property, business house,

hotel or railroad depot: *Provided, however,* that such consent may be revoked by such property owner or person, corporation or company having control thereof, giving at least ten days' written notice to be served on the owner or driver of such vehicle and a copy thereof, with proof of such service, filed with the City Clerk: *And provided further,* that the City Commission shall have the power at any time to revoke such consent or permit: *And provided further,* that this section shall not be construed to prevent or interfere with the driver of any licensed vehicles hereinbefore mentioned from temporarily stopping at any convenient place, not elsewhere prohibited by ordinance, for the purpose of discharging or receiving passengers."

The petitioner contends that this section, if enforced against him, will destroy the profits of his business; that there is no express authority from the state justifying its enactment; that it does not protect or purport to protect the health, safety, morals or welfare of the public, and is not a proper exercise of police power. It is claimed that the section is unreasonable, oppressive, uncertain, not uniform in its operation, discriminatory, in restraint of trade, and that it deprives him of his property and earnings without due process of law. There is the further contention that the ordinance delegates to private persons and others the power to enforce its provisions and to determine who are entitled to its benefits, and to discriminate between persons engaged in the same line of business, and further, that it permits private individuals to confer a monopoly upon favored firms and individuals. We may pass by a great deal of surplusage in the petition, such as the averments that it is opposed and condemned by a large majority of the public, and that protests against it have been signed by many business men.

The various grounds urged against the validity of the ordinance have been pleaded and presented in the petitioner's brief in the form of a general indictment. Before attempting to consider them it is proper to state some general rules that are applied in the construction of city ordinances.

Where the city has authority to act, it is governed by its own discretion, and not that of the courts. (*Fisher v. Harrisburg,* 2 Grant [Pa.], 291.) So, where an ordinance is within the express power granted, the court can only construe the extent of the grant, and has nothing to do with the reasonableness of an ordinance carrying it into effect. Our attention has not been directed to any statute conferring express power upon

the city to enact the particular provisions of section 9, and the respondents rely upon the general grant to cities of the first class of power over streets; the powers conferred upon such cities to issue licenses and to regulate the business of operating hackneys, taxicabs, and other vehicles transporting merchandise, baggage or passengers for hire (Gen. Stat. 1915, § 1221) ; and the grant of the police power, and the authority conferred by the general welfare clause. It has been said that—

"Where the power to legislate on a given subject is conferred, and the mode of its exercise is not prescribed, then the ordinance passed in pursuance thereof must be a reasonable exercise of the power, or it will be pronounced invalid." (2 Dillon on Municipal Corporations, 5th ed., § 600; *City of Lake View v. Tate*, 130 Ill. 247, 252.)

An ordinance may be adjudged reasonable as applied to one state of facts and unreasonable when applied to circumstances of a different character; and facts may be pleaded and proved tending to show it to be unreasonable as applied to a particular person. (*City of Chicago v. Gunning System*, 214 Ill. 628, 641; *Penna. R. R. Co. v. Jersey City*, 47 N. J. L. 286.) "But the courts will declare an ordinance to be void because unreasonable *upon a state of facts being shown* which makes it unreasonable." (2 Dillon on Municipal Corporations, 5th ed., § 591. See, also, *City of Emporia v. Railway Co.*, 94 Kan. 718, 147 Pac. 1098; *Smith v. Hosford*, 106 Kan. 363, 187 Pac. 685.)

Upon the theory of the law just stated, it is averred in the petition that for years it has been the custom and habit of persons engaged in the taxicab business to stand and solicit business in front of the railway stations in the city, not only for the profit and benefit of themselves, but for that of the traveling public, and that section 9 in no way benefits the public or any person, except those using it to secure a monopoly of the taxicab business, and it is alleged that the Payne Taxicab and Baggage Company, or a business conducted in that name, has negotiated with certain railway companies for a monopoly of the business of operating taxicabs to and from their railway stations in the city. The same allegations are made with respect to the owner of a certain hotel in the city. And in this connection it is alleged that the railway companies are public common carriers of freight, passengers, baggage, and express, and have published and declared their rates and the character

of their business, and that their stations in the city are for the benefit and use of the traveling public.

The answer of the respondents, after denying the contention that section 9 is discriminatory, and alleging that every taxi driver has equal opportunity to obtain the permit from the abutting property owners in order to use any portion of a street as a hack stand, alleges that section 9 goes no further than to recognize the rights of property owners to prevent the use of public streets abutting their property for private purposes without their consent; and that the rights of the public are protected by the provision that such consent may be revoked by the city commission if it finds that any hack stands are interfering with the use of the public street for the regular purposes of public traffic. It is admitted, however, in the answer that the Payne Taxicab Company is operating under an agreement with the Rock Island and Union Pacific railway companies by which it is given exclusive privilege to stand its taxicabs and solicit business upon the property of these railroads and to solicit business in their depots and on their station platforms. It is alleged that neither company has given consent, as provided under the ordinance, for any person to use the public streets abutting their depots for the purpose of hack stands, but on the contrary both have notified the city authorities that they desired all taxicabs kept away from the public streets adjacent to their property, and that such streets be left open for the convenience and use of ordinary traffic and such private vehicles as have occasion to stop from time to time at the stations. The answer also admits that under the provisions of section 9 the managers of the National Hotel have given their consent that the Payne Taxicab Company may stand taxicabs at the side entrance of the hotel, and have given no consent to any other party.

Before taking up the contention that the ordinance is void because it permits and authorizes the creation of a monopoly, we may first inquire whether in other respects section 9 is oppressive, partial or unfair, or authorizes unwarranted discriminations. If it is open to these objections it must be held unreasonable. The petitioner relies upon the Salvation Army case (*Anderson v. City of Wellington*, 40 Kan. 173, 19 Pac. 719), and kindred cases. In that case an ordinance declaring it

Mader v. City of Topeka.

unlawful for any person, society, association, or organization, under whatsoever name, to parade the public streets shouting, singing, or beating drums, etc., or playing upon musical instruments, or doing any other act designed to attract or call together an unusual crowd of people upon the streets without having first obtained in writing the consent of the mayor, or in his absence, the president of the council, city clerk or the city marshal, in the order named, authorizing such parade, was held to be of doubtful delegated power and unreasonable because it did not fix the conditions uniformly and impartially, and contravened common right. The opinion, by Commissioner Simpson, has frequently been cited in textbooks and by other courts in support of the general proposition. It is insisted that the doctrine of that case and other decisions which have followed and approved it (*Crawford v. City of Topeka,* 51 Kan. 756, 33 Pac. 476; *Paola v. Wentz,* 79 Kan. 148, 98 Pac. 775, and similar cases) control the present case. We do not think so. The principles declared in those cases are only in the most general way applicable. It is well settled that it is within the general powers of cities to protect the traveling public from imposition and annoyance or improper conduct on the part of baggagemen and taxi drivers, and that ordinances enacted for the purpose of regulating such business are not unreasonable nor open to the objection that they unjustly discriminate where all are treated alike. This court has held that a regulation of a city requiring hackmen and others who solicit passengers at railway stations, to occupy certain places designated by the city marshal, is not invalid nor open to the claim of discrimination in the regulation because it placed them all under the direction and control of the city marshal, which was held to be a reasonable and practical method of regulation. (*Ottawa v. Bodley,* 67 Kan. 178, 72 Pac. 545, cited in Note, L. R. A., 1915F, 726.) It has been held that it is no objection to the validity of such an ordinance that it requires the solicitors and vehicles to remain within the stands assigned, although some are much more advantageous than others, so that the hotels receiving the more favorable assignments have a material advantage over others. (*City Cab, Carriage & Transfer Co. v. Hayden,* 73 Wash. 24.)

Is the ordinance invalid because it delegates power to abutting property owners to grant or withhold the consent? It will

be observed that this consent is not required for the purpose of passing over the streets nor for stopping to discharge a passenger or to take on a passenger; it forbids the establishing of a hack stand by the proprietor of a taxicab or hack in any portion of a public street without first obtaining the written consent of the abutting owner. The petition relies upon the recent case of *Smith v. Hosford*, 106 Kan. 363, 187 Pac. 685. The ordinance involved there placed it in the power of the city officers to grant a permit to build a garage or to refuse such permit at will; the city clerk was prohibited from issuing the license or permit until the application was first approved by the board of commissioners. It was held that it left the granting of the permit to the arbitrary discretion of the municipal authorities without any limitations or restrictions, and for that reason was void. It is true, in the present case there is no limitation or restriction on the rights of the abutting property owners to grant or refuse the permit, but the ordinance recognizes the inherent right of the property owner to insist that the public streets shall be maintained for strictly public purposes; unless he sees fit to waive his rights by giving his consent to the standing of hacks or taxicabs on the street in front of his property. It cannot be doubted that the abutting owner possesses valuable property rights in a public street which are not enjoyed by the public. His right to ingress and egress to and from his property cannot be unduly restricted. (*Longnecker v. Railroad Co.*, 80 Kan. 413, 102 Pac. 492.) He may enjoin an obstruction or nuisance in the street which occasions a special annoyance, inconvenience or damage to him. The interest of the abutting owner in a shade tree growing in the street is as sacred as any other property right. (*Paola v. Wentz*, supra.) The title to the land comprising the street is not in the city, but in the county, and upon a vacation of the street, the title reverts to the abutting owners. (*Wallace v. Cable*, 87 Kan. 835, 127 Pac. 5.) It has been held, as against the abutting owner and without his consent, even the legislature has not the power to confer upon any person the right to make use of the highway for any other purpose than to pass and repass. (*McCaffrey v. Smith*, 41 Hun. [N. Y.] 117.) An ordinance which permitted owners and drivers of hackney coaches to occupy and use the side of a public street on which plaintiff's storerooms fronted,

Mader v. City of Topeka.

as a hackney coach stand, in such manner as to constitute an unlawful interference with the use of the plaintiff's premises, was held void. It was said:

"As well might the city authorize permanent booths or structures for the use of dealers in the various articles of trade. Having no rent to pay, the occupants could accommodate the public at better rates." (*Branahan v. Hotel Co*, 39 Ohio St. 333, 334.)

The petitioner has no inherent right to make a public hack stand of any part of the street. Doubtless, in the absence of an ordinance attempting to regulate the use of the streets in this respect or to prohibit all taxicab drivers from so doing, they may be left free to use the streets in that way until prevented by a lawful ordinance. The provision requiring the property owner's consent before the street may be occupied for the purposes of establishing hack stands is not unreasonable. It is not open to the objection that it permits unlawful discrimination, because it applies to all proprietors of hacks and taxicabs and to all abutting owners. It leaves no unregulated discretion in some officer of the corporation. It provides for all of the terms under which the permit is to be issued and prescribes a uniform rule applicable to all of the classes to which it applies. The argument that in order to avoid violation of the ordinance, taxi drivers in the city are compelled to procure the written consent of the property owners abutting upon miles of streets, is based upon the unwarranted assumption that the ordinance forbids the petitioner and others similarly situated from traveling upon the streets in the prosecution of their business. The consent of abutting property owners is required only where a taxicab driver seeks to establish a public stand for soliciting business.

A case in point is *McFall v. City of St. Louis et al.,* 232 Mo. 716, in which substantially all the contentions raised here are determined adversely to the petitioner. It was there held that a municipal ordinance is not invalid as unconstitutionally granting special privileges, which allows the municipality to grant special permission to licensed taxi drivers who can procure the consent of the abutting property owners, to stand their vehicles in the street in front of such property, when the same privilege is not granted to those who do not obtain such consent. (See, also, *Landberg v. Chicago,* 237 Ill. 112, 21 L.

R. A., n. s., 830; *City of New York v. Reesing*, 77 App. Div.
[N. Y.] 417.)

The remaining question for consideration is the validity of
the ordinance as affecting the rights of the abutting owner of
railroad property. The conceded facts are that under the au-
thority of the ordinance certain railroad companies have
granted to a competitor of the petitioner the exclusive privilege
of standing his taxicabs and to solicit business upon the rail-
road property and in the stations and on the station platforms.
Exclusive franchises granted by a city are not always unlawful,
although creating legal monopolies. (*O'Neal v. Harrison*, 96
Kan. 339, 150 Pac. 551; *Desser v. City of Wichita*, 96 Kan. 820,
153 Pac. 1194.) In the O'Neal case it was held:

"Under a statute giving it power to make regulations to secure the
general health, to prevent and remove nuisances, and to compel and
regulate the removal of garbage and filth beyond the corporate limits, a
city may grant an exclusive right to the highest bidder to remove all gar-
bage, the term being defined, in the ordinance authorizing the action, to
mean 'all rejected food, offal'. *In re Lowe*, Petitioner, 54 Kan. 757, 39
Pac. 710, overruled." (Syl.)

The opinion, however, quoted with approval from 2 Dillon on
Municipal Corporations, 5th ed., § 678, in which the reasons
for upholding the granting by a city of an exclusive right to
remove garbage and refuse matter are expressly stated to be
that—

"Garbage matter and refuse are regarded by the decisions as in-
herently of such a nature as to be either actual or potential nuisances.
By reason of the inherent nature of the substance, it is therefore not a
valid objection to an ordinance requiring disposal in a specified manner
that garbage has some value for purposes of disposal, and that the effect
of the ordinance is to deprive the owner or householder of such value,"

and that upon these considerations it is within the power of
the city to grant an exclusive franchise.

So far as the question as to granting a monopoly affects the
present case, it turns upon whether a distinction must be made
between railroad property and the property of other abutting
owners. And upon this question there is an irreconcilable con-
flict in the decisions. The averment in the petition that for
years it has been the custom and habit of persons engaged in
the taxicab business to stand and solicit business at these rail-
road stations, and upon portions of the railway ground used by

the public for that purpose, can hardly be said to add anything to the petitioner's rights, because assuming that he was one of those formerly favored in this respect, he was a mere licensee liable at any time to have his license revoked. He had no express authority to make use of the railroad stations or grounds for the purpose of soliciting passengers or establishing a hack stand. Referring to the same contention in a similar case, the New Hampshire supreme court, in *Hedding v. Gallagher*, 72 N. H. 377, said:

"But it is elementary that a mere license to enter upon land is not by lapse of time changed into an absolute right of entry. . . . But all such licenses are in their nature revocable, and if actually revoked, and due notice given to an individual or class of individuals, and they still persist in entering, it is without a license, and the owner has a right to exclude them." (p. 383.)

The defendants in that case, who were insisting upon the right to enter upon the railroad property to solicit the business of carrying the baggage of passengers, were common carriers themselves. It was held, however, that the railroad company might give such right to one individual or common carrier and exclude others from its grounds, if the reasonable requirements of passengers were fully met, and in reference to the railroad's duty to its passengers in this respect, it was said:

"Whether the soliciting agents are independent local truckmen, or whether they are men specially permitted by the railroad to perform that service in its station, is an unimportant detail in the reasonable performance of the public duty to passengers of providing adequate facilities for the transfer of baggage," (p. 380.)

and that to hold the contrary

"is the assertion of a principle founded upon the radically erroneous assumption that the property of a railroad may be used by others, without compensation and against the protest of the corporation, for the prosecution of their private business." (p. 381.)

Among the cases cited by the petitioner in his brief is *New England Express Company v. Maine Central Railroad Company*, 57 Me. 188, holding that one common carrier was legally required to carry another common carrier (an express company) although such other carrier desired to conduct an independent business on the property of the first. The decision was overruled by the supreme court of the United States in the *Express Cases*, 117 U. S. 1.

Not only in the earlier decisions, but in the more recent ones, the courts have divided upon the question whether a railroad company may lawfully permit a hack company to have the exclusive right to stand and solicit patronage upon the railroad company's premises and exclude all other hackmen, provided adequate accommodations are furnished to passengers arriving at or departing from the station. One line of decisions asserts that the upholding of such an exclusive privilege prevents competition between rival carriers of passengers, creates a monopoly in the privileged hackmen likely to result in inconvenience and loss to persons traveling over the railroad or those having freight transported over it, and in effect confers upon the railroad company the control of the transportation of passengers beyond its own lines, a right not granted by its charter and against the interests of the public. These decisions take the ground that the question affects not only the excluded hackmen, but the interests of the public, and that the railroad company cannot arbitrarily, for its own pleasure or profit, admit to its platforms or depot grounds one carrier of passengers or merchandise and at the same time exclude all others. The leading cases supporting this doctrine are: *Lucas et al. v. Herbert et al.,* 148 Ind. 64; *Pennsylvania Co. v. Chicago,* 181 Ill. 289; *Hack & Bus Co. v. Sootsma,* 84 Mich. 194; *Montana Union Co. v. Langlois,* 9 Mont. 419; *Cravens v. Rodgers,* 101 Mo. 247; *Indianapolis Union R. Co. v. Dohn,* 153 Ind. 10; *State v. Reed,* 76 Miss. 211; *McConnell v. Pedigo & Hays,* 92 Ky. 465; *Palmer Transfer Co. v. Anderson,* 131 Ky. 217.

The Kentucky court, in reaffirming its decision in the Pedigo & Hays case, *supra,* held that—

"A contract by which a railroad gave a transfer company the exclusive use of a part of its station grounds along which there was a gravel walk, and which was most convenient to the trains on which the greater number of passengers arrived and departed, so that such passengers were compelled to walk 150 feet past the transfer company's cabs before reaching a place where the other cabs could stand, gave the transfer company a practical monopoly of the transfer business, and was void." (*Palmer Transfer Co. v. Anderson,* supra.)

Among the English authorities supporting the same doctrine are *Parkinson v. Great Western Ry. Co.,* 6 C. P. (L. R.) 554; *In re Palmer and Brighton, etc., Ry. Co.,* 6 C. P. (L. R.) 194; *In re Marriott,* 1 C. B., n. s., 499.

In a note by Mr. Freeman to the Sootsma case, *supra,* in 22 American State Reports 699, the author asserts that— .

"Notwithstanding the serious conflict existing between the authorities upon this subject, we think the better reasoning sustains the doctrine approved in the principal case; namely, that a railway company or other common carrier may exclude all persons from its depot or grounds who are not using or seeking to use its means of carriage, but it cannot grant an exclusive right or more favorable preference to one individual or company engaged in soliciting patronage from its passengers, than it gives to another individual or company engaged in the same line of business. It seems to us that an agreement to grant such exclusive privilege to any one person is contrary to public policy and the spirit of our laws, especially in the face of a statutory or constitutional provision existing in nearly all of the states prohibiting discrimination in charges or facilities for transportation between carriers or individuals, or in favor of either." (p. 699.)

In reference to the conflict upon the subject in the decisions, the author says:

"Still, we apprehend that the majority of them, as well as the better reasoning, are in support of the English doctrine above announced." (p. 699.)

All the cases holding this doctrine recognize that the railway companies which control depot grounds and buildings may make needful rules for their regulation, and protect passengers and others lawfully on their grounds from annoyance.

The following American cases sustain the doctrine that a common carrier may grant an exclusive privilege to one and exclude all others who desire to go upon his premises for the sole purpose of soliciting customers or business: *Old Colony Railroad Co. v. Tripp,* 147 Mass. 35 (The Chief Justice and two Associate Justices dissenting) ; *Boston & Albany Railroad v. Brown,* 177 Mass. 65; *Kates v. Atlanta Baggage & Cab Co.,* 107 Ga. 636; *N. Y., N. H. & H. R. R. Co. v. Bork,* 23 R. I. 218; *Hedding v. Gallagher,* 72 N. H. 377; *Norfolk & W. R. Co. v. Old Dom. Baggage Co.,* 99 Va. 111; *State v. Depot Co.,* 71 Ohio St. 379; *New York, N. H. & R. R. Co. v. Scovill,* 71 Conn. 136; *Fluker v. The Georgia Railroad and Banking Co.,* 81 Ga. 461; *McFall v. City of St. Louis,* 232 Mo. 716; *Railroad v. Davidson,* 33 Utah, 370; *Union Depot & Ry. Co. v. Meeking,* 42 Colo. 89; *Depot Carriage & B. Co. v. Kansas City Terminal Ry. Co.,* 190 Fed. 212; *Skaggs v. Kansas City Terminal Ry. Co.,* 233 Fed. 827.

In *Donovan v. Pennsylvania Company,* 199 U. S. 279, it was held that the arrangement with the Parmalee company gave it an opportunity to control to a great extent the business of carrying passengers from the depot to other railway stations and hotels, or private houses.   It was said:

"But in a real, substantial, legal sense, that arrangement cannot be regarded as a monopoly in the odious sense of that word, nor does it involve an improper use by the railroad company of its property." (p. 297.)

The reasoning of the cases upholding exclusive contracts of this character are well stated by the supreme court of Utah in the case of *Railroad v. Davidson,* supra.   That was an action for injunction.   The defendant had fenced off a portion of its depot grounds for the accommodation of passengers arriving or departing on the trains and for the convenience of cabs and other vehicles engaged in transporting passengers and baggage to and from its trains.   It permitted all persons to enter the fenced-off portion to have access to the trains if engaged to meet incoming passengers or to deliver baggage, but required them to leave the inclosure as soon as they had received such persons or baggage or after delivering the baggage or passengers at the trains.   The company had entered into an arrangement with a reliable company owning suitable carriages and other vehicles for the transportation of passengers and had given it the exclusive privilege of entrance into the inclosure.   In the opinon it was said:

"Appellants argue that they obtain the right from the fact that the respondent may not discriminate as between applicants in conferring the privilege, and that, if it grants it to one, then it has waived the right to exclude all others and must admit all."   (p. 377.)

It was said that the mere fact that the grantee is not excluded, would not give appellants the legal right to enter. In the opinion it was said:

"Assuming that the respondent may not create a monopoly in this regard, and for that reason the exclusive privilege granted to one is void as against public policy, how does this give the appellants the right to enter upon the respondent's premises for the purpose of soliciting business?   Does the granting of an exclusive privilege to one, which, as is contended, is illegal and void, transform what are termed mere privileges into absolute rights?"   (p. 378.)

It was further said:

"If appellants desire to be carried as passengers or intend to deliver or receive freight, they may enter upon respondent's premises as a matter of right. All or any one of them may also do this in behalf of another who has business with respondent; but this gives them no legal right to require the respondent to devote any of its property to their use for the purpose of soliciting business for themselves." (p. 378.)

In some of the decisions upholding similar exclusive contracts by railroad companies, it has been asserted that the numerical weight of authority in this country supports that doctrine; on the other hand, it has been as often asserted in decisions denying the right of a railway company to make such a contract, that the numerical weight of authority upholds that contention. The conflict as to this matter is generally supported in each instance by drawing distinctions between the facts involved in some of the cases, and eliminating them from the count. Without attempting to determine upon which side rests the numerical weight of authority, we approve the reasoning of the cases following the supreme court of the United States in the Donovan case, and hold that it is no objection to the validity of the ordinance that it permits abutting property owners, including railroad companies, to make such exclusive contracts.

In the Donovan case, *supra*, the Pennsylvania Company owned a passenger station in Chicago and had made a contract with the Parmalee Transfer Company under which two of its agents were permitted to stand within the depot building to solicit the custom of passengers. The appellants were hackmen and insisted on the right to have two of their number enter the building to solicit custom. The main question was the right of the hackmen to solicit business within the station over the appellee's protest. The court held that, "Its property is to be deemed, in every legal sense, private property as between it and those of the general public who have no occasion to use it for purposes of transportation." (p. 294.) The circuit court enjoined the hackmen from congregating on the sidewalk in front of, adjacent to or about the entrances of the passenger station, and there soliciting custom. Both the court of appeals and the United States supreme court held that the injunction was too broad, and that only *"such congregating"* on the sidewalk could be restrained *"as would interfere*

with the ingress and egress of passengers and employees." (p. 301.) Justice Harlan, who wrote the opinion, held that—

"Licensed hackmen and cabmen, unless forbidden by valid local regulations, may, within reasonable limits, use a public sidewalk in prosecuting their calling, provided such use is not materially obstructive in its nature; that is, of such exclusive character as, in a substantial sense, to prevent others from also using it upon equal terms, for legitimate purposes. Generally speaking, public sidewalks and streets are for use by all, upon equal terms, for any purpose consistent with the object for which such sidewalks and streets are established; subject, of course, to such valid regulations as may be prescribed by the constituted authorities for the public convenience; this, to the end that, as far as possible, the rights of all may be conserved without undue discrimination." (p. 303.)

It was further said:

"The city has no power or authority to grant the exclusive use of its streets to any private person or for any private purposes; but must hold and control the possession exclusively for public use, for purposes of travel and the like." (p. 302.)

In the present case the ordinance forbids the use of the streets in front of railway stations as cab stands, without the consent of the abutting owner, and permits the owner of the station to grant an exclusive permit to one individual to use the streets for that purpose. While it is conceded that the railroad companies concerned in the particular contracts in question have notified the city that they would grant no permit for the use of the street in front of their stations as a hack stand, the validity of the ordinance in this respect is involved in the case, but since, in our opinion, there is no ground for a distinction between the right of the owner of railroad property abutting upon a street and that of any other abutting property owner, it follows that the ordinance is not void in this respect.

The writ will, therefore, be denied.