No. 22,844.

MISSOURI PACIFIC RAILROAD COMPANY, *Appellant*, v. DAVID KOHLER et al., *Appellees*.

SYLLABUS BY THE COURT.

RAILROADS—*Right to Control Use of Its Private Property—Validity of Grant of Special Privilege to Certain Cabmen to the Exclusion of Others.* A railway company by contract may grant to a firm of cab and baggage men an exclusive privilege to board its passenger trains to solicit the patronage of passengers and to arrange for their safe and expeditious transportation to other railroad stations; and may also grant to such firm an exclusive right to stand its vehicles on a portion of the property owned by the railway company when the space

so granted is not required for the necessary and convenient use of the public having business with the railway company; and in the absence of valid statutory authority a city may not authorize its police officers to interfere with the reasonable exercise of the exclusive privileges so granted.

Appeal from Montgomery district court; JOSEPH W. HOLDREN, judge. Opinion filed November 6, 1920. Reversed.

*W. P. Waggener, J. M. Challis,* both of Atchison, and *S. H. Piper,* of Independence, for the appellant.

*A. M. Etchen,* of Coffeyville, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: This action questions the validity of a contract for certain exclusive privileges granted by a railway company to a firm of cab and baggage men in and about the railway company's station grounds and trains at Coffeyville.

The city of Coffeyville has railway service supplied by three railroads, the Missouri Pacific, the Katy, and the Santa Fe. Each of these has its separate depot. In 1914 the Missouri Pacific, plaintiff, conceived the idea of providing transportation service from its own depot to those of the other railroads operating in and out of Coffeyville, so that passengers, express and baggage might be furnished through service over its own lines and connecting carriers at Coffeyville. To that end it made a contract with defendants which, in part, reads:

"Whereas, it is mutually desired by the parties hereto that all such passengers, and their baggage, including property checked as baggage, as well, be promptly transported from the depot of the company to the depot of the carrier at said junction point upon and under those certain terms and conditions hereinafter set forth.

. . . . . . . . . . . . .

"1. The contractor shall promptly and safely transport, by proper and safe conveyance, any and all baggage, including property checked as baggage, as well as passengers, immediately following arrival of same at depot of the company at said junction point, and free of cost to the company or to said passengers, respectively, to the depot of the carrier, thereat, if and when the company shall have transported same to its said depot on a through ticket or tickets reading to any place or places on or reached via the line of the carrier. . . . The contractor shall pay to the company monthly, in advance, on or before the 1st day of each calendar month of the full term hereof, compensation computed at the rate

of one hundred twenty dollars ($120.00) per annum; and, also the contractor shall, when and as requested so to do by the superintendent of the company or his authorized representative, transfer any and all supplies, including stationery and small office equipment, for the company between each depot and the general offices of the company in said city of Coffeyville.

"(3) A. The company also hereby grants to the contractor, during the full term of this agreement, the right and privilege of soliciting patronage, for the contractor's cab and baggage service, on the passenger trains of the company entering the city of Coffeyville, said solicitation to include the taking up and re-checking of passengers' baggage by duly authorized representatives of the contractor, such representatives, when and while engaged in such solicitation, to be transported, as one of the considerations of this agreement and without further charge, . . . provided, however, that each and all of said things, so to be done by the contractor as well as by said representatives under this paragraph, shall be done at such time or times and in such manner as may be designated by and be satisfactory to the superintendent of the company or his authorized representatives, and as may be required by ordinances of said city of Coffeyville and the laws of the state of Kansas, as well as the state of Oklahoma.

"B. The contractor, at its sole cost and risk, shall provide uniformed solicitors to canvass such of said passenger trains as may be designated by said superintendent, . . . and shall require said employee at all times to be courteous and polite to its patrons, both upon the premises of the company . . .

"4. This agreement shall be held to grant unto the contractor the privilege, exclusive as against all other and different persons as well as corporations so far as the company may lawfully so contract (a) to bring and stand busses, carriages, motors and other and different vehicles at such place or places, on as well as adjacent to the company's station premises in Coffeyville. . . ."

The defendant's contractor, David Kohler, failed to pay the monthly sums stipulated in the contract, and this action was begun by the railway company for their collection. Defendant answered, admitting the execution of the contract, but set up as his principal defense an ordinance of the city of Coffeyville, which among other matters regulating the standing and running of hacks, carriages and omnibuses in Coffeyville, provided:

"Section 3. That the owner, driver, or person in charge of any hack, omnibus or carriage for hire, shall be under the control and direction of the chief of police, or police, while at any railroad depots in said city for the purpose of delivering passengers or baggage and attending trains, and such owners, drivers or persons in charge shall occupy such place

and stands at such depots as may be ordered and fixed by the chief of police or police and as may be most convenient for the public. It shall be unlawful for any owner, driver or person in charge of any hack, omnibus, or carriage for hire to willfully disobey any such orders and directions made by the chief of police or the police."

Defendant alleged that pursuant to this ordinance the chief of police had designated certain places upon the company's depot grounds mentioned in the contract to others than himself, thereby depriving him of the exclusive right attempted to be granted to him by the contract, and that the contract was without consideration, and in violation of the said ordinance, against public policy, lacked mutuality, and was void. He further answered that upon several occasions subsequent to the execution of such contract, he had attempted to exercise the rights and privileges granted and was prevented from so doing by the chief of police, and that such prevention operated as a discharge of the contract. He also alleged that certain places had been designated by the agent of the railroad company upon the station grounds where he was permitted to maintain exclusive cab-stand privileges by the railroad company, which places had not been so designated by the chief of police, and that he was forcibly prevented from so exclusively occupying and using such depot grounds by the chief of police.

The other defendants were sureties on Kohler's bond and their answers were to the same effect.

The case was tried upon an agreed statement of facts to which was attached a plat of the depot grounds. The execution of the contract was conceded; also that Kohler had been arrested and fined $10 in the police court for standing his cab on the depot grounds as privileged by the contract but at a place not designated by the chief of police, and that no appeal had been taken from the police court judgment. It was also stipulated that the plaintiff had permitted the general public to use its grounds for receiving, discharging and taking up passengers and baggage and had permitted vehicles to be driven thereon by the public. It was further admitted—

"That said defendant Kohler has been denied the exclusive right to occupy said depot grounds by the chief of police of the city of Coffeyville, but such denial on the part of the authorities of the city of Coffeyville was not acquiesced in or agreed to by the plaintiff in this case."

Laying aside for the moment the consideration of the Coffey-ville city ordinance and the interference of the chief of police, the contract between the plaintiff and defendant was one to facilitate the transportation of passengers and baggage be-tween the different railroads in Coffeyville. Through traffic arrangements between different railroads is in the public in-terest, and where the expense is not large and the want of it is seriously detrimental to the public such arrangements have sometimes been compelled by law. (*The State, ex rel., v. Rail-road Companies*, 85 Kan. 649, 118 Pac. 872.)

The exclusive privileges conferred by the contract d'd not impair or diminish any rights of the general public. The pub-lic was in no way discommoded by the privilege of permitting the defendant to board its passenger trains and negotiate with passengers for the expeditious transportation of their persons and baggage to other railway depots or elsewhere in Coffey-ville. But while one hack and bus line might be granted such a privilege, it would create an intolerable situation to have sev-eral rival and competing hackmen going through the trains on a similar errand. Doubtless the state, and perhaps the city, could regulate the service governed by such a contract, to make certain that the public should be adequately and conveniently served and that the charge exacted for such service be limited to a reasonable figure. And this would be true also in the mat-ter of the privilege of keeping a cab stand on the station grounds.

But a wholly different question arises when we have to con-sider a positive interference with such a service by city au-thority. These grounds are not public property. They are the private property of the railway company, and so long as free and convenient access to the railway depot was not im-paired the railway company could lawfully grant to a cabman an exclusive privilege to stand his cab at an agreed or desig-nated point on its own property. And certainly it could not be compelled, at least without a statute, to grant cab stands to everybody. We note on the map attached to the agreed state-ment of facts that on the railway property there are located an express office and space for Van Noy's news-and-notions agency. How came these concessions to be thus established? Undoubtedly by contract and exclusive concessions obtained

from the landowner, the railway company. Could it be said that, without a statute, the city of Coffeyville could authorize its chief of police to order the express office to be moved to some other part of the railway company's property, or to grant equal privileges to other express companies to permanently occupy space on the railway property? (4 R. C. L. 593, 594.) If there is any difficulty in solving the present problem we are largely relieved of that task by the supreme court of the United States, which has had to consider a substantially similar exclusive privilege granted by the Pennsylvania Railroad Company to the Parmalee Transfer Company at the union passenger station in Chicago. (*Donovan v. Pennsylvania Company,* 199 U. S. 279.) That court held that so long as the public was adequately and conveniently accommodated the railway company could "make arrangements with, including the granting of special privileges to, a single concern to supply passengers arriving at its terminals with hacks and cabs, and it is not bound, at least in the absence of valid state legislation requiring it to do so, to accord similar privileges to other persons, even though they be licensed hackmen." (Syl. ¶ 1.)

In the opinion the court said:

"Although its functions are public in their nature, the company holds the legal title to the property which it has undertaken to employ in the discharge of those functions. And as incident to ownership it may use the property for the purposes of making profit for itself; such use, however, being always subject to the condition that the property must be devoted primarily to public objects, without discrimination among passengers and shippers, and not be so managed as to defeat those objects. It is required, under all circumstances, to do what may be reasonably necessary and suitable for the accommodation of passengers and shippers. But it is under no obligation to refrain from using its property to the best advantage of the public and of itself. It is not bound to so use its property that others, having no business with it, may make profit to themselves. Its property is to be deemed, in every legal sense, private property as between it and those of the general public who have no occasion to use it for purposes of transportation. . . .

"Applying these principles to the case before us, it would seem to be clear that the Pennsylvania Company had the right—if it was not its legal duty—to erect and maintain a passenger station and depot buildings in Chicago for the accommodation of passengers and shippers as well as for its own benefit; and that it was its duty to manage that station so as to subserve, primarily, the convenience, comfort and safety of passengers and the wants of shippers. It was therefore its duty to

see to it that passengers were not annoyed, disturbed or obstructed in
the use either of its station house or of the grounds over which such
passengers, whether arriving or departing, would pass. It was to that
end—primarily as we may assume from the record—that the Pennsyl-
vania Company made an arrangement with a single company to supply
all vehicles necessary for passengers. We cannot say that that arrange-
ment was either unnecessary, unreasonable or arbitrary; on the contrary,
it is easy to see how, in a great city and in a constantly crowded railway
station, such an arrangement might promote the comfort and convenience
of passengers arriving and departing, as well as the efficient conduct of
the company's business. The record does not show that the arrange-
ment referred to was inadequate for the accommodation of passengers.
But if inadequate, or if the Transfer Company was allowed to charge
exorbitant prices, it was for passengers to complain of neglect of duty
by the railroad company and for the constituted authorities to take steps
to compel the company to perform its public functions with due regard
to the rights of passengers. . . .

"Here the defendants press the suggestion that they are entitled to
the same rights as were accorded by special arrangement to the Parmalee
Transfer Company. They insist, in effect, that as carriers of passengers
they are entitled to transact their business at any place which, under the
authority of law, is devoted primarily to public uses—certainly at any
place open to another carrier engaged in the same kind of business. But
this contention, when applied to the present case, cannot be sustained.
The railroad company was not bound to accord this particular privilege
to the defendants simply because it had accorded a like privilege to the
Parmalee Transfer Company; for it had no contractual relations with
the defendants, and owed them as hackmen no duty to aid them in their
special calling. . . In maintaining a highway, under the authority of
the State, the first and paramount obligation of the railroad company
was, as we have already said, to consult the comfort and convenience of
the public who used that highway. To that end it could use all suitable
means that were not forbidden by law. . . .

"This question is not controlled by any statute of Illinois. . . .
It does not appear that the State has undertaken by any statute to
compel the railroad company to share the use of its depot grounds and
station with hackmen and cabmen seeking to use them only to solicit
custom for themselves. Whether such a statute would be valid, we need
not now consider or determine." (pp. 294-298.)

The supreme court of Michigan has considered the same
question and reached a similar conclusion. In *Dingman v.
Duluth, etc., R. Co.,* 164 Mich. 328, 32 L. R. A., n. s., 1181,
1184, it was said:

"To give to section 6266, 2 Comp. Laws [1897], the construction con-
tended for by plaintiff, would result in depriving the public of one of the
most valuable privileges incident to public travel. That the privilege of

dealing with a competent and trustworthy baggage agent is a valuable one seems too obvious for argument. The traveling stranger is often ignorant of the location of termini or his destination, and the best means of transportation to and from the same. He is entitled to receive this information, and to receive it from one whose position upon the train is a guaranty that he is responsible and may be safely intrusted with the person or property of the traveler. In large cities, scores, nay hundreds, are engaged in the same business as is the plaintiff. To compel the railroad company to transport all persons who desired to solicit the transportation of passengers or baggage would of necessity result in the refusal of the company to carry any, and, as a consequence, the denial to the traveling public of a service of the greatest possible importance.

"But suppose the railroad, instead of refusing to carry all, permitted two or more baggage agents upon its trains. The conditions which would result from such a course would at once become intolerable. Rival agents would besiege the passenger for his business to his infinite annoyance, and when he finally made a selection he would have no means of knowing that he had chosen either a competent or responsible agency for its transaction. It may be urged that the passenger is subjected to the same annoyance upon his arrival at his destination. If this is so it is because he voluntarily transacts his business at the depot, rather than upon the train. But the conditions at the depot are different from those upon the train. At the depot the competition for his business is ordinarily duly regulated and under the supervision of the police, a safeguard entirely wanting upon trains." (p. 330.)

The trend of all the later decisions seems to be to the same effect (10 C. J. 657), although such was not the earlier view. (10 C. J. 659.) Defendant cites our own case (*Ottawa v. Bodley*, 67 Kan. 178, 72 Pac. 545), as opposed to this view. That case was decided before *Donovan v. Pennsylvania Company*, supra, by the supreme court of the United States. Moreover, in the Bodley case there was no question of contractual rights between the railway company and the hackman. If Bodley had been able to justify his assumption of cab-standing privileges on railway property not necessary for the convenient use of the general public a different result might have been reached in his appeal. And this brings us to a consideration of the Coffeyville ordinance. Doubtless, as said in the Bodley case, a city has full authority to regulate railroad depots and depot grounds as far as concerns the needs and convenience of the general public who have business with the railway company. It is also correct that a city may establish reasonable regulations touching the conduct of hackmen who collect about the depot to solicit patronage, and the power to designate places

for the rival hackmen—all of whom have equal rights and no more—may properly be vested in a police officer. But such considerations do not justify disregard of a private contract between a hackman and the railway company for the exclusive privilege of standing his hack upon a portion of the railway company's property which is not otherwise needed for the convenient and efficient discharge of the railway company's corporate duties of transportation. In the absence of valid and specific statutory authority the city cannot lawfully interfere through its chief of police or otherwise with the reasonable use of the concession granted by the plaintiff to the defendant hackman. In *Mader v. City of Topeka,* 106 Kan. 867, 189 Pac. 969, the court had to consider other phases of this general subject, but in that case the city ordinance recognized certain private rights of ownership held by the railway company, while the city ordinance in the present case seems to overlook those rights.

If the city has transcended its authority, or the chief of police, through misinterpretation of the ordinance, has transcended his powers or acted arbitrarily in disregard of the defendant's lawful contractual rights, adequate pursuit of redress at law or equity by the defendant would not have failed him. Neither the ordinance nor the interference of the police with the defendant's lawful exclusive privilege was a defense in the present action. This conclusion necessitates a reversal of the judgment, and it is so ordered.