RED TOP CAB COMPANY, Appellee, v. JAMES McGLASHING et al.,
Appellants.

**MUNICIPAL CORPORATIONS:** Streets—Vacation and Conveyance—
1    **Effect.** A city has no property rights in a cab stand established on
land vacated by the city and conveyed to a railway company. (See
Book of Anno., Vol. 1, Sec. 6206.)

**CARRIERS:** Control and Regulation—Discrimination—Exclusive Grant
2    **of Cab-stand Privileges.** A railway company may grant exclusive
rights to a cab stand on its own premises when such grant is not
arbitrary or unreasonable.

**JUDGMENT:** Relief Granted—Absence of Prayer—Effect. No decree
3    of injunction should be rendered against an intervener when plain-
tiff answered the petition of intervention, but prayed for no relief.

Headnote 1:  10 C. J. p. 657 (Anno.)  Headnote 2:  10 C. J. p. 657.
Headnote 3:  31 Cyc. p. 524.

Headnote 2:  16 L. R. A. (N. S.) 781; L. R. A. 1915B, 358; 22 R. C. L.
824.

*Appeal from Linn District Court.*—JOHN T. MOFFIT, Judge.

MAY 10, 1927.

REHEARING DENIED NOVEMBER 15, 1927.

Defendants (engaged, as is plaintiff, in the cab business)
and intervener, the city of Cedar Rapids, appeal from a decree
restraining them from trespassing on or interfering with plain-
tiff's enjoyment of a cab stand on depot grounds to which plain-
tiff claims exclusive right, under lease from the railroad com-
panies.—*Modified and affirmed.*

*Charles Penningroth* and *George E. Farmer*, for interven-
er, appellant.

*Maurice P. Cahill* and *W. C. Boland,* for other appellants.

*Deacon, Sargent & Spangler,* for appellee.

Morling, J.—The Chicago & Northwestern and the Chicago, Rock Island & Pacific Railway Companies have a union depot in Cedar Rapids, which, with the platforms, extends in a northerly and southerly direction on the west side of all tracks. At the north end of the depot building is a space about 40 feet long, used for mail trucks. The main platform is on the east side of the depot building, and extends north from the building about 200 feet to Third Avenue. The railroad companies are the owners of the property west of the platform, which (exclusive of the baggage stand later referred to) is 36 feet 6 inches in width, east and west. The strip immediately west of and adjacent to the platform, 11 feet 6 inches in width (at the greatest), extending from the mail stand north to Third Avenue, is leased by the railroad companies to the plaintiff for a cab stand. The defendants are owners of rival cab lines, and the effect of the lease is to compel them to park their cabs west of the 11½ feet cab stand, leaving plaintiff's cabs between them and the platform. This interferes with the ability of the defendants to get employment from incoming passengers, and makes it inconvenient for such of their outgoing passengers as desire to take trains direct from the cabs.

An ordinance of 1896, under which parts of Fourth Avenue and of an east and west alley were vacated and conveyed to the railroad companies for depot purposes, provided:

"Section 5: Said railway companies shall forever maintain in a suitable condition for travel, a driveway not less than twenty-five (25) feet in width in the rear of their passenger station and extending from 3rd to 5th Avenues for the purpose of affording the public access to said station. Said railway companies shall, however, have the right to maintain a fence about said station grounds and said driveway with gates therein at 3rd, 4th and 5th avenues and at the alleys in Blocks 26 and 27, to the end that said railway companies may beautify the grounds in the rear of the station with flower beds and grass plots and may properly police the same and exclude intruders. Said gates shall be opened at all reasonable hours for the accommodation of the public, but the said railway companies may employ and station gatemen thereat and may exclude from said station grounds all persons except those arriving from or about to depart upon the trains of the railway com-

panies or having other business to transact with said railway companies at said station, under such reasonable rules and regulations as said companies may adopt. Such gate rules to be approved by the city council of the city of Cedar Rapids, Iowa.''

The railroad companies paved the entire strip, 36 feet 6 inches in width, from Third Avenue south to the mail stand, and have repaved and continuously repaired it since the ordinance was passed. This paved strip, after deducting the part leased to plaintiff for cab stand, is 25 feet in width. The driveway extends from Third Avenue on the north to and along the west side of the depot building, and on to Fifth Avenue at the south. One of the main entrances to the depot is on the west side, opening on Fourth Avenue. The vacated alley was 20 feet wide. The south 20 feet of the cab stand would be in the alley, if the alley had not been vacated. The land immediately west of the 36½ feet of brick paving is also owned by the companies, and was for a number of years fenced, and used by them as a flower garden. In 1912, this plot was leased by the railroad companies to the city of Cedar Rapids for a baggage stand, and has since been used for that purpose.

I. Defendants and intervener, while stating in argument that no question of title is involved, urge that the alley was vacated and conveyed for depot purposes only; that the city, therefore, retained an interest in that area; that the entire space between the platform and the baggage stand, and (south of the baggage stand) between the platform and the end of the alley, as left after it was vacated, has been used as a street, and for the convenience of the patrons of the railroad companies in general, has been regulated by the police, and kept clean by the street-sweeping department; that the contract evidenced by the ordinance was made to conserve such interests, and by user and acquiescence the curb has become the eastern boundary of the driveway. The title to the property is in the railroad companies. They have paved, repaired, and repaved it. The use has been by its patrons, and, so far as it has been by the public generally, was under and pursuant to the right given by the ordinance. The ownership of the railroad companies, the limitation of the right to travel, subject to the maintenance of fences and gates, and the right of the companies to exclude all

1. MUNICIPAL CORPORATIONS: streets: vacation and conveyance: effect.

persons not having business with the railroad companies, are expressly reserved by the ordinance. No condition has arisen to bring up any question of boundary, or of the rights of the city or public as adverse to the companies. It would be absurd to say that the companies were required to fence or otherwise mark off the extra width of the paved area, in order to preserve their unincumbered title to it. The lease does not infringe the 25-feet roadway. There is no merit in the contention that intervener or the public has any property rights in the cab stand.

II. The principal question is whether the railroad companies may grant exclusive rights to a cab stand on its own property when such grant will give an advantage, or, as defendants claim, tend to create in the lessee a monopoly of the business from incoming passengers and place other cabmen at an inconvenience in discharging outgoing passengers at the station. We may say that this inconvenience is not serious. All passengers to outgoing trains may be landed at the main entrance on the west side of the depot. While there is evidence tending to show that passengers frequently desire to take trains standing on the tracks south of Third Avenue, without going to the depot, and while the plaintiff might land its passengers at any place along the platform, whereas other cabmen would be required to discharge them either at Third Avenue or at points along the driveway, from which they would be compelled to pass between the plaintiff's cabs, or perhaps, if the cab stand is fully occupied, be unable to pass, such inconvenience is not of any considerable importance.

2. CARRIERS: control and regulation: discrimination: exclusive grant of cab-stand privileges.

The land in question is the private property of the companies. It is for the reason and to the extent that the carrier has granted to the public an interest in its property and business that its right of absolute ownership and power to contract are restricted. For all purposes, except as inimical to its public duties, the property of a railroad company is its own, as fully and absolutely as is the property of private owners. *Western Union Tel. Co. v. Pennsylvania R. Co.*, 195 U. S. 540; *Donovan v. Pennsylvania Co.*, 199 U. S. 279. See *Tyson v. Banton*, 273 U. S. 418 (71 L. Ed. 718); *Continental & Commercial Tr. & Sav. Bank v. Muscatine, B. & S. R. Co.*, 202 Iowa 579. The defendants have no legal right to the use of the

property of the companies without their consent, for the solicitation or transaction of business thereon.   The defendants' contention is not that they have a property interest in or right of entry on the railroad land, but that the companies have assumed to perform without discrimination a public service, and that the lease in controversy is discriminatory, and tends to a monopoly.   A railroad company as a common carrier may not discriminate between patrons or grant one or one class advantages over others.   The defendants, however, are not patrons of the railroad companies, and are not demanding the service for the performance of which the companies were created, and which they are required to render to all members of the public alike.   The defendants have no standing to set up the rights of patrons.   The carrier performs its duty to its patrons when it affords reasonable and proper means of access and exit to and from its premises, without preference or discrimination.   It is not required to look after their transportation to or from its premises.

There is no reason why a railroad company should be denied the right to contract with whomsoever it chooses, for the private use of its premises, when such use will not conflict with the performance of its public duties.   The utilization by carriers of all legitimate sources of income from the use of their property is a matter in which the public has an interest.   Without doubt, the companies might have excluded all cabs from their premises.   There is no discrimination against passengers, for all are admitted to the premises on equal terms from the same points, save that access to the platform opposite the cab stand and access from the platform to other cabs may be wholly or partly obstructed by plaintiff's cabs.   No monopoly, in the evil sense of the word, has been created.   The partial monopoly, if any (using the term in its popular meaning), consists merely in making it impracticable to discharge at all times outgoing passengers at any point on the main platform, and difficult to secure incoming passengers, most of whom take cabs at the platform, and naturally take cabs next to the platform.   To a degree, these inconveniences would exist if plaintiff did not have an exclusive lease.   The evil of a monopoly, if one exists, is its injury to the public, by unduly restraining trade or suppressing reasonable and healthy competition, or by unreasonably re-

stricting employment, and its immediate or ultimate tendency to raise prices. By the lease the plaintiff is required to furnish a sufficient number of cabs to reasonably accommodate all patrons of the companies at all times of day and night, to keep its cabs in good and sanitary condition, and to comply with the statutes and all municipal regulations. Adequate cab service is thereby secured. Moreover, defendants or other cab owners are not prohibited from parking their cabs at a distance of not greater than 11½ feet from the curb, or on the streets, though the evidence shows that they may not park in the driveway west of the depot. Any cab may take passengers to the depot, and discharge them at either of the streets or on the driveway and on paving a few steps from the platform, or at the west entrance. The defendants are not prohibited from going into the depot or upon the platforms, or from soliciting business there. If they were so prohibited, the public has as much interest in the regulation of depot buildings and platforms by the suppression of the disorders, disturbances, and annoyances frequently resulting from unrestricted importunity of cab drivers as it has in the saving of a few feet of extra travel, or in the employment of more than one cab line. The power to fix reasonable rates is in the hands of the intervener. Code of 1924, Section 5970. See *Ritchhart v. Barton,* 193 Iowa 271. Without further elaborating, we think that such contracts, when not arbitrary or unreasonable (and the one under consideration is not), should be sustained, in accordance with the holding of the great majority of the courts which have passed upon the question. *Donovan v. Pennsylvania Co.,* 199 U. S. 279; *Depot C. & B. Co. v. Kansas City Tr. Co.,* 190 Fed. 212; *Black & White Taxi. & T. Co. v. Brown & Yellow Taxi. & T. Co.,* 15 Fed. (2d Series) 509; *Old Colony R. Co. v. Tripp,* 147 Mass. 35 (17 N. E. 89, 9 Am. St. 661); *Thompson's Exp. & Stg. Co. v. Mount,* 91 N. J. Eq. 497 (111 Atl. 173, 15 A. L. R. 351); *Godbout v. St. Paul U. D. Co.,* 79 Minn. 188 (81 N. W. 835, 47 L. R. A. 532); *State ex rel. Sheets v. Union Depot Co.,* 71 Ohio St. 379 (73 N. E. 633, 68 L. R. A. 792, 2 Ann. Cas. 186); *Kates v. Atlanta Baggage & Cab Co.,* 107 Ga. 636 (34 S. E. 372); *Rose v. Public Service Com.,* 75 W. Va. 1 (83 S. E. 85); *Dingman v. Duluth, S. S. & A. R. Co.,* 164 Mich. 328 (130 N. W. 24); *Missouri Pac. R. Co. v. Kohler,* 107 Kan. 673

(193 Pac. 323); *Mader v. City of Topeka,* 106 Kan. 867 (189 Pac. 969); *Clisbee v. Chicago, R. I. & G. R. Co.* (Tex. Civ. App.), 230 S. W. 235; *Union Depot & R. Co. v. Meeking,* 42 Colo. 89 (94 Pac. 16); *Oregon Short Line R. Co. v. Davidson,* 33 Utah 370 (94 Pac. 10); *Baggage & O. T. Co. v. City of Portland,* 84 Ore. 343 (164 Pac. 570); and see other cases cited in 10 Corpus Juris 657. For cases holding contrary doctrine, see *Montana Union R. Co. v. Langlois,* 9 Mont. 419 (24 Pac. 209, 18 Am. St. 745, 8 L. R. A. 753); *Indianapolis Union R. Co. v. Dohn,* 153 Ind. 10 (53 N. E. 937, 45 L. R. A. 427); *Pennsylvania Co. v. City of Chicago,* 181 Ill. 289 (54 N. E. 825, 53 L. R. A. 223); *Palmer Transfer Co. v. Anderson,* 131 Ky. 217 (115 S. W. 182, 19 L. R. A. [N. S.] 756); *State v. Reed,* 76 Miss. 211 (24 So. 308, 43 L. R. A. 134); *Lucas v. Herbert,* 148 Ind. 64 (47 N. E. 146, 37 L. R. A. 376). The Supreme Court of Michigan, while formerly recognized, under *Kalamazoo H. & B. Co. v. Sootsma,* 84 Mich. 194 (47 N. W. 667, 22 Am. St. 693), as adopting the doctrine of the last cited cases, in *Dingman v. Duluth, S. S. & A. R. Co.,* 164 Mich. 328 (130 N. W. 24), distinguished the former case, and on the question then before it, put itself in harmony with the majority rule. See 10 Corpus Juris 659. Most of the cases adopting the doctrine of invalidity of such contracts were committed to it before the question was passed upon by the Supreme Court of the United States in *Donovan v. Pennsylvania Co.,* 199 U. S. 279. If we were otherwise in doubt on the question, we should give much weight to the consideration that the Federal rule has become firmly settled. In *Black & White Taxi. & T. Co. v. Brown & Yellow Taxi. & T. Co.,* 15 Fed. (2d Series) 509, that rule was accepted as a principle of general jurisprudence, and applied in opposition to the one adopted by the court of last resort of the state. A rule that would result in such diversity and conflict ought not to be adopted, in the absence of compelling reasons therefor.

III. The city of Cedar Rapids intervened, for the purpose of establishing the right of the public to the use of the roadway and the right of access to and exit from the railroad property.

3. Judgment: relief granted: absence of prayer: effect. The plaintiff answered the petition of intervention, but asked for no relief against the city. The decree enjoins the city, as well as the defendants, from trespassing upon the leased property or from

interfering with plaintiff's use of it. The city, as has been said, has been in the habit of cleaning the paving, including the flushing of it. It has exercised police superintendence. Under the technical terms of the decree the flushing or cleaning of the cab stand by the city, or the entry upon it by its police force, might, with some plausibility, be asserted as a trespass, and therefore a violation of the injunction. Even if not so, the city has not been heard upon the question of the necessity or extent of its right to exercise sanitary and other police oversight of the cab stand. The relief to which the plaintiff is entitled as against the city is no more than a dismissal of the petition of intervention, and the decree will be modified accordingly. Plaintiff argues that, if this matter had been called to the attention of the trial court by motion, it might have been corrected. The decree, however, by a separate and distinct paragraph specifically enjoins the city. We cannot assume that the plaintiff, who was the successful party, was not aware of or not insisting on the form of this decree before it was entered.

One third of the costs will be taxed to the plaintiff, one third to the defendants, and one third to intervener.—*Modified and affirmed.*

EVANS, C. J., and DE GRAFF, ALBERT, and KINDIG, JJ., concur.