# Smith, Appellant, *v.* N. Y., L. E. & W. R. R. Co., Lessees.

*Railroad company—Station—Reasonable regulations—Railroad police— Act of February 27, 1865—Trespass.*

A railroad company has a right to make reasonable regulations in regard to the use of its station; such as ordering that hacks shall not stand in front of the ladies' entrance.   It may also order a person not a passenger to leave the inner platform.   And it has a right, by its police appointed under the act of Feb. 27, 1865, to enforce such regulations and such order, using such force as is necessary for the purpose.

Argued April 26, 1892.   Appeal, No. 34, Jan. T., 1892, by plaintiff, B. F. Smith, from judgment of C. P. Crawford Co., Sept. T., 1888, No. 65, on verdict for defendant.   Before PAXSON, C. J., STERRETT, WILLIAMS, McCOLLUM and HEYDRICK, JJ.

Trespass for personal injuries.

At the trial before MEHARD, P. J., specially presiding, the court directed a verdict for the defendant in a charge of which the following is the material part:

" The story upon which plaintiff relies for a recovery is that on the 10th of July, 1888, he was a hackman engaged, amongst other things, in carrying passengers to and from the station of

defendant company. He tells you that upon that day he had an order from Judge Pettis to meet a certain train there to receive a passenger, and that in response to that engagement he went to the railroad station and drove up to what is termed the ladies' entrance; he tells you that he arrived there about the time the train was coming in, and that he got off his carriage or hack, and that in a little while Mr. Nelson came out of the station and told him to move his hack away from there; he tells you that he told Nelson he would do so when he had received his passenger, but that Nelson insisted upon his doing so then, and that he still refused to do so. He says that Nelson then took hold of the reins of his horses and attempted to lead them away; that when he got hold of the reins of one of them he resisted and, in doing so, he says he kicked at Nelson and resisted as much as he was able to the taking away of his team of horses; he tells you that Nelson led his team of horses to the other side of the road, and that he had gotten down off the platform of the station; and that in the meantime Blystone came up and Nelson told him to arrest plaintiff and take him to the lockup; that Blystone attempted to do so and he resisted, and Nelson came and they both got hold of him and he resisted as much as he was able, and in the struggle he was down on the platform and they attempted to take him away, and at this point Judge Pettis came upon the scene and interfered and said, amongst other things, that he would see that Smith would be forthcoming to answer anything they might have against him, and thereupon they allowed plaintiff to go free.

"Now the question is, gentlemen of the jury, whether the defendant is responsible under the uncontradicted evidence in this case. The plaintiff tells you that Nelson was a policeman in the employ of the railroad company; that Blystone was also such policeman. Defendants admit this, and say they were so employed and received their commissions from the governor of the state.

"There is a general act of assembly in this state providing for the appointment of policemen in and around depots of railroad companies. It was passed on 27th of February 1865. . . .

"The plaintiff tells you that for two years prior to the occurrence of the 10th of July, he had been told more times than one not to stand his hack or carriage at the platform of the ladies'

entrance to this station, but he would claim that he was not
standing his carriage there at that time, but that he had driven
up to receive a passenger.   That claim his own statement con-
tradicts.   He tells you that he was employed by Judge Pettis
to go there and receive a passenger, but the evidence shows that
no passenger was then waiting to get into his carriage and that
even Judge Pettis himself did not come there until after a
good part of the trouble had transpired.

" Now [this was a regulation which the company had a right
to make.   It was a reasonable regulation for the proper con-
duct of their business, and when the plaintiff was ordered by
Nelson, whom he knew to be a policeman in the employ of the
company, to remove his carriage from the entrance, it was his
duty to obey,] [1] not only because Nelson was authorized to
that effect by the company, but because Nelson had the double
authority of employment of the company and that of the com-
monwealth of Pennsylvania conferred by the commission of the
governor.   He was there as a public police officer, one whom the
law provided for and whom the chief executive officer of the
commonwealth had commissioned.   Now Nelson, according to
plaintiff's statement, did not then attempt to do violence to ·
him, but he did attempt to carry out himself the order which
he had given Smith and which he refused to carry out, namely,
to lead the horses and carriage away from the entrance ; and
that was the occasion of the altercation that took place.

[" Smith tells you that he resisted with as much force as he
could, . . . . He then became guilty of a breach of the peace,
which is an offence against the commonwealth and which was
a lawful and sufficient ground for the police officer to arrest
him.   Nelson then called upon his brother policeman, Blystone,
to arrest plaintiff and take him to the lockup, and plaintiff tells
you that, instead of submitting to these representatives of the
law, he resisted both Nelson and Blystone as much as he was
able to, in which he was guilty of a further offence against the
law, and that was the cause of his receiving whatever violence
he did receive at that time, and therefore is a conclusive an-
swer, to my mind, to any claim he could make for damages.
. . . . Hence, for the injury which he claims to have sustained
on 10th of July, we think he has no ground whatever for re-
covery.] [2]

" Now upon the 13th July the plaintiff tells you that he was inside the station on the inner platform of defendant company; he tells you that he was in company with a friend of his, and while he was there the division superintendent, Brunn, met and asked him what he was doing there, and he replied that he was doing nothing, and then Brunn told him he wanted him to go away, and then Brunn said to him that up to that time he had taken no part in the matter (whatever that may have referred to), but that now he would push him to the wall, and ordered him peremptorily to go away. Plaintiff says that he did not go away but remained there for ten or fifteen minutes; and then Nelson, the same man who had participated in the trouble of 10th July, came up to him and asked the same questions and received the same answers, and then Nelson told him to go away, and he says he did not make any motion to go away, and then Nelson took hold of him and pushed him through the waiting room and off the platform of the station, and that there he fell down on his hand and knees. One or two witnesses for the plaintiff stated what he did not state and this was that plaintiff told Nelson that he was there to see Mr. Parker off on the train. One of the witnesses said that plaintiff so told Brunn and that Brunn ordered him away. Another witness says that Nelson, when he spoke to him, received that information from plaintiff and that Nelson turned to Mr. Parker and asked him if he needed any assistance; that Parker replied he did not; that Nelson offered to furnish him any assistance he might need, and then ordered plaintiff to go away, and that plaintiff did not go away and then Nelson took hold of him and put him out as the plaintiff himself described.

" Now, gentlemen of the jury, when railroad companies furnish waiting rooms and stations they are for the accommodation of passengers chiefly. They are not exclusively for their accommodation, because an invitation may be implied for the passengers' friends to come and meet them or see them off. Now that same invitation extends, upon the same grounds, to passenger trains when they are in the depot. The implication is made from the custom of the people.

" It is usual for friends to go to the station to see friends off and to meet them, and it is usual for friends to enter with their departing friends into the car and to see them off and then to

come out again, and this is not ordinarily objected to by the railroad company; but that is not because the railroad has no right to object if they see fit. [While the N. Y., L. E. & W. R. R. Co. may ordinarily permit persons desiring to enter the inner platform of their station to see friends off, to do so, and while persons who are there on that mission are there lawfully in a sense, yet if the company sees fit to exclude them from that place they have the right to do so, and they can confine the use of that inner platform wholly and solely to passengers, strictly speaking, and if they see fit to order a person to go out from that place, it is the duty of that person to do so. . . .

" When the plaintiff then received an order from the superintendent to go out from there, it was his duty to do so, and especially so when, as he tells you, he had replied, in answer to Mr. Brunn's inquiry what he was doing there, that he was doing nothing, and when Nelson came up to him in the capacity of an employee of the company, and as a policeman appointed by the commonwealth, and asked him the same questions and then told him to go out, he had not the authority to say that he would remain there until parties went away, but it was his duty to go out, and when he refused to do so, as we understand the rights of the parties, it was then the right of Nelson, in the exercise of his employment and of his office, to eject him, using such force as might be necessary to that end.] [3]

" Now the plaintiff tells you that Nelson took him by the arm and by the shoulder and pushed him rapidly through the platform and waiting room, and across the outer platform, and off the outer platform, then he went down on his hand and knees. He tells you that Nelson did not strike him, and [there is no evidence in the case, gentlemen of the jury, which we think is sufficient to submit to you to say that Nelson did use more force than was reasonably necessary under the circumstances, in view of the size, apparent strength and evident obstinacy of the plaintiff, and therefore upon that ground he has no right to recover.] " [4]

Plaintiff's first seven points were refused by the court as not justified by the case.

*Errors assigned* were, (1–4) portions of the charge as above, in brackets; (5–11) refusal of defendant's points; (12) instructing the jury to find for defendant.

*Pearson Church*, for appellant.

*F. P. Ray*, for appellee.

PER CURIAM, May 23, 1892:

There are twelve specifications of error in this case, all of which relate to the charge of the court and answers to points. A careful examination of them fails to disclose substantial error. The defendant company had a right to make reasonable regulations in regard to the use of its station. It had a right to order that hacks should not stand in front of the entrance, and the plaintiff having willfully disobeyed such order, it was competent to remove him. In doing so, no more force appears to have been employed than was necessary. A number of points were submitted by the plaintiff, which, as abstract propositions, are undoubtedly correct. They were refused by the learned judge below, upon the ground that they had no application to the facts of the case. In this he was right.

Judgment affirmed.