# PUBLIC SERVICE RAILWAY COMPANY

## *v.*

## THE TOWNSHIP OF WEEHAWKEN.

[Decided November 28th, 1922.]

1. Where a grant of a right of way was made by a railroad company to the Public Service Railway Company to afford access to certain ferries landing at a plaza upon which numbers of people congregated to take passage, an implied or incidental grant to the Public Service Railway Company to erect a fence around its right of way coudl not be presumed, since such a fence would add to the congestion and be a menace to life and a public nuisance, since it must be presumed that the conditions were within the contemplation of the contracting parties at the time the grant was made, although not then foreseen.

2. Where a railroad company granted a right of way to the Public Service Railway Company to operate cars across a plaza giving access

to the railroad company's ferries, the Public Service Railway Company could not fence its right of way as a regulation of the plaza in right of the railroad company, which, while having a right to reasonably regulate the plaza, could not exclude local carriers awaiting passengers from the ferry, it appearing that the fence would have such effect.

3. Nor could the Public Service Railway Company fence off its right of way so as to exclude jitneys, on the ground that to erect such fence would be for its own protection, the Public Service Railway Company not having any exclusive rights as against the traveling public.

4. Under such circumstances the township in which the plaza lay could resist the erection of such a fence as a police measure, the plaza though not dedicated to the public being nevertheless affected with a public interest.

5. Where a railroad company maintained a plaza to give access to certain ferries, the fact that the township policed and gave fire protection there was insufficient to work a dedication of the plaza to the public, and the fact that the railroad company was assessed and paid taxes therefor, refuted the claim of dedication of the use of the plaza to the public.

On bill, &c.    On final hearing.

*Mr. William H. Speer,* for the complainant.

*Mr. Albert Leuly* and *Mr. William C. Asper,* for the defendant.

BACKES, V. C.

The West Shore railroad operates two ferries on the Hudson between its Weehawken terminal and Forty-second street and Cortland street, New York, for the transportation of its railroad passengers, and the public traveling between the two places. The approach to the ferry at Weehawken from the nearest public highway—the boulevard—a thousand yards away, is down Clifton road from an elevation of one hundred and fifty feet or more, southerly and easterly, to a plaza about sixty feet wide and of much greater length, maintained by the West Shore railroad along and in front of the ferry for convenient entrance and exit. In 1895 the West Shore (to be exact, the West Shore and Ontario Terminal Company) granted to the assignor of the Public Service Railway Company a right of way, at some points twenty-two and

others twenty-five feet in width, from the boulevard down Clifton road to the easterly side of the plaza, and thence northerly, lengthwise the plaza, to the ferry entrance. The last stretch is close to one hundred and twenty feet, called the "spur," and is the point in the right of way involved in this litigation. The right of way is described by metes and bounds, and the use is defined and limited to "to construct, operate and maintain a double-track railway thereon, and to run cars over the same propelled by electricity or cable, and to erect poles for carrying wires on any portion of said tract." The Public Service and its predecessors in title have ever since occupied the right of way with double tracks, and until about eight years ago ran all cars terminating at the ferry to the end of the spur. Then a loop was installed just south of the spur, and until a few weeks before the filing of this bill all cars were switched on the loop. In the meanwhile jitneys used the spur for loading and unloading passengers and for parking while waiting for the ferry. It would appear that the loop furnishes adequate accommodations for switching cars, but the Public Service desires to resume the spur for certain of its lines, and that is its right. It also wants to fence in the spur, which means taking up nearly half the width of the plaza, and means also, practically, the exclusion therefrom of the jitneys because of the lack of turning space. Weehawken, which has for years policed and regulated the traffic at the plaza, has prevented the erection of the fence, and to restrain this interference this suit is brought. The provoking factor of the controversy is undoubtedly the jitney, though the Public Service protests that its only aim is the protection of its passengers from injury and itself from pecuniary liability for injury, while Weehawken claims that its single thought is to protect and safeguard the traveling public. Sincere, in a sense, no doubt, but disavowing, as both do, any ulterior purpose, it is too obvious for discussion that the object of the Public Service is to hamper and destroy jitney competition, while that of Weehawken is to encourage and maintain it. The motive of either is unimportant in law. The question is one of strict legal right. To succeed the Pub-

lic Service must make out its case upon the strength of its own title. The grant does not expressly give the right to enclose the right of way with a fence, but it is the contention of the Public Service that that is implied as incidental to the full and complete enjoyment of the easement, and cites in support *Willoughby* v. *Lawrence, 116 Ill. 11; Patout* v. *Lewis, 51 La. Ann. 210; Herman* v. *Roberts, 119 N. Y. 37; Chandler* v. *Goodridge, 23 Me. 78; Harvey* v. *Crane, 12 L. R. A. 601; Cooper* v. *Louanstein, 37 N. J. Eq. 284,* and *Dunn* v. *English, 23 N. J. Law 126.* These authorities are not sustaining, for, as it seems to me, the devotion of the plaza by the West Shore to *quasi*-public use alone denies the implication, and the present-day tax upon the capacity of the plaza forbids a construction of the grant that a right of enclosure was intended to be given. Let me explain.

When the grant was made twenty-seven years ago few used the ferry. Then Forty-second street was uptown New York and Weehawken had a history. An enclosure of the spur would have been as harmless then as it would have been useless. Now Weehawken is thickly populated and the ferry is the outlet to North Jersey homes of the New York business men and worker. Daily thousands of ferry users, residents of New Jersey and employed in New York, avail themselves of the jitneys to carry them to and from the ferry: many use the trolleys; the better off have their automobiles. Then there is the through vehicular traffic, commercial and private. The ferry is overloaded and it does not and cannot meet its obligations. On the New York side automobiles stand in double rows, and for blocks, and sometimes for hours to cross, and on the Weehawken side conditions are even worse. Waiting has become a habit. During the rush hours the milling and jostling and jam in the plaza is a human whirlpool. A fence almost through the centre of the plaza, as proposed, would add immeasurably to the congestion and confusion and would be nothing short of a menace to life and a public nuisance. This condition, while not foreseen at the time of the grant of the right of way, must, nevertheless, be presumed to have been within the contemplation of the contract-

ing parties, and to my mind utterly repels any implied or incidental grant upon which the Public Service, in the main, rests its right to relief.

It was urged on the argument and in the briefs that the West Shore has the right to regulate the use of the plaza, and that, inasmuch as it is offering no objection to the fence enclosure, the Public Service, in right of the West Shore, is merely regulating the use. The railroad's right to reasonably regulate the plaza is indisputable, but that right is not heritable. Furthermore, any regulation upon the part of the West Shore would have to be consistent with its duty to its passengers to furnish reasonable transportation, and that means not only on its trains and boats but also to and from them—not to carry them, of course, but to provide suitable facilities at its stations (in this case the ferry) for the approach of their chosen means of conveyance. If the West Shore itself were to furnish ample and convenient means, at reasonable fare, for its incoming passengers at Weehawken to reach their destination, it would be its right to exclude from the plaza local carrier competition. And it could hire a local carrier for this purpose and give him a monopoly. But it could not exclude local carriers awaiting passengers, who had hired them, no more than it could prevent a private car coming to meet its owner. Nor could the West Shore prevent a local carrier, be he hackman or jitneur, from entering the plaza to discharge his passengers at the ferry. All the authorities to which my attention has been called by the briefs, and many more that I have consulted, so hold. *Donovan* v. *Pennsylvania Railroad Co., 199 U. S. 279; Smith* v. *New York, Lake Erie and Western Railroad Co., 24 Atl. Rep. 304; Napman* v. *People, 19 Mich. 352* The right of railroads to make reasonable rules and regulations in the use of their stations, and the limitationss, are stated by Mr. Justice Swayze in *Thompson's Express and Storage Co.* v. *Mount, 91 N. J. Eq. 497.* The obvious fact that the fence would eliminate the jitney, and thus deprive the ferry users of this, their chosen means of conveyance, answers the question of reasonable regulation.

Another point made by the Public Service is that it is not only its right but its duty to fence in the right of way so as to protect the throngs from injury, and itself from damages for injury. The answer is that it assumed the risk when it took over the right of way, and that if it observes reasonable care no harm can come to it. The higher degree of reasonable care imposed upon it because of the crowds finds compensation in increased fares. The Public Service has all along presumed that it has rights in the plaza superior to other carriers of passengers to the ferry. I do not think so. It has as to the West Shore a vested right of location, but as to the traveling public it has no more right there than one afoot, those coming by jitney or by private conveyance, and as to all of them it must exercise a reasonable care, at times a high degree of care.

The Public Service urges that it is entitled to a decree because Weehawken is an intruder and without standing. Weehawken's resistance to the erection of the fence was justified as a police measure. *Freund Pol. Pow.* § *175.* The plaza, though not dedicated was nevertheless affected with a public interest, and, furthermore, while the duty of policing it and regulating the travel was a self-imposed task, that duty was assumed by Weehawken upon the invitation of the West Shore, upon whom the law placed the burden of protecting its passengers.

Weehawken maintains that the plaza is public domain by dedication. The plaza is not a public place in the sense that it has been dedicated to public use. Policing and giving fire protection does not work a dedication. More than that is necessary to deprive an owner of his land in favor of the public. *Kiernan* v. *Jersey City, 80 N. J. Law 273.* The West Shore dedicated to the township of Weehawken part of Clifton road, stopping short of the plaza, and it was formally accepted, and the West Shore is assessed and pays taxes for the plaza. This refutes dedication.

The bill will be dismissed.